**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**www.flmb.uscourts.gov**

| | |
|---|---|
| In re | Chapter 11 |
| FICO FINANCIAL CORPORATION | Case No. 8:21-bk-03853 |
| PARUSA INVESTMENT CORPORATION | Case No. 8:21-bk-03854 |
| Debtors | *Joint Administration Pending* |

_____/

**DEBTORS' APPLICATION TO EMPLOY**
**KEEN SUMMIT CAPITAL PARTNERS, LLC AS REAL ESTATE BROKER AND**
**AUTHORIZE USE OF PROPERTY OF THE ESTATE OUTSIDE ORDINARY COURSE**

Parusa Investment Corp. and FICO Financial Corp. (collectively "**Debtors**") hereby file this Application to Employ Keen Summit Capital Partners, LLC (the "**Application**") as Real Estate Broker ("**Broker**" or "**Keen**") and Authorize Use of Property of the Estate Outside the Ordinary Course. In support of this Application, the Debtors state the following:

**JURISDICTION**

1.     This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 157 and 1334.

2.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A).

3.     Venue is proper in this District pursuant to 28 U.S.C. § 1408.

4.     On July 23, 2022 (the "**Petition Date**"), the Debtors filed voluntary petitions for relief (the "**Petition**") under Chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the Middle District of Florida, Tampa Division.

5.     The Debtors have also filed, or will be filing, a motion to jointly administer their cases.

6.     The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

## BACKGROUND

7.      The Debtor, Parusa Investment Corporation ("**Parusa**") is the owner of a parcel of land located at 801 S. State Highway 161, Grand Prairie, Texas 75051, and an adjacent 2.0537-acre vacant parcel of land.

8.      The Debtor, FICO Financial Corporation ("**FICO**") owns real property located in the following locations:

    a.      5850 W. Cypress Street, Tampa, Florida 33607;

    b.      3300 Highlands Parkway, Smyrna, Georgia 30082; and

    c.      2015-2039 State Highway 60 East, Lake Wales, Florida, 33853.

(collectively the above properties are referred to as the "**Properties**.").[1]

9.      A detailed description of the Debtors and their businesses is set forth in the Case Management Summary filed on or about the Petition Date.

10.     The Debtors have determined that a sale of some or all of the Properties through a plan of reorganization and § 363 sale is in the best interests of the estates and creditors.  The Debtors desire to employ Keen to facilitate those sales, without delay.

11.     The Debtors have determined that Keen's services will substantially enhance their attempts to maximize the value of the sale of the Properties. The Debtors believe that Keen is well qualified to perform all services contemplated by the "**Retention Agreement**" attached hereto as **Exhibit A**, and to represent the Debtors' interests in these chapter 11 cases, in a cost effective, efficient and timely manner.

---

[1] Reference to all of FICO's properties does not require that each be sold.  In fact, the Lake Wales property located at 2015-2039 State Highway 60 East, Lake Wales, Florida is not included in the Retention Agreement, without prejudice to FICO listing it for sale at a later date.

12.     Keen has extensive experience representing debtors and owners of distressed real estate assets in bankruptcy proceedings and other distressed and insolvency proceedings. Keen has advised numerous chapter 11 debtors in connection with similar issues related to their restructuring efforts, including in the following cases before the United States Bankruptcy Court for the District of Delaware: *In re Maxus Energy Corporation, et al.*, Case No. 16-11501 (CSS); *In re Newbury Common Associates, LLC, et al.*, Case No. 15-12507 (LSS); *In re Coldwater Creek, Inc.*, Case No. 14-10867 (BLS); *In re Friendly Ice Cream Corp.*, 11-13167 (KG); *In re Hancock Fabrics, Inc.*, Case No. 07-10353 (BLS); *In re The Lovesac Corp.*, 06- 10080 (CSS); *In re Brown Schools*, Case No. 06-50861 (MFW); and *In re Mobile Tool Int'l, Inc.*, Case No. 02-12826 (MFW).

13.     The proposed compensation for Keen, fully set forth in the Retention Agreement, is summarized as follows:[2]

      a.     Broker earns 4% of gross proceeds from the sale of each Property, plus all reasonable out of pocket expenses incurred by the Broker in connection with the services provided.

      b.     If the buyer of a Property is properly represented by a real estate broker, then Company shall pay an additional one percent (1%), which fee shall be payable to the buyer's broker.

      c.     As set forth below, the Broker shall prepare a marketing budget for each Property included in the Retention Agreement for marketing costs not to exceed $25,000 per Property.

14.     The proposed services to be performed by Keen include the following:

      a.     On request, review pertinent documents and will consult with the Debtors' counsel, as appropriate;

---

[2] A complete description of the proposed compensation of Broker is contained in Exhibit A.

    b.    Coordinate with the Debtors regarding the development of due diligence materials, the cost of which shall be the Debtors' sole responsibility;

    c.    Develop, subject to the Debtors' review and approval, a marketing plan and implement each facet of the marketing plan;

    d.    Communicate regularly with prospects and maintain records of communications;

    e.    Solicit offers for a Transaction;[3]

    f.    Assist the Debtors in evaluating, structuring, negotiating and implementing the terms and conditions of a proposed Transaction;

    g.    Develop and implement, subject to the Debtors' review and approval, an auction plan, including arranging auction logistics, assisting the Debtors' counsel with auction bid procedures, assisting the Debtors to qualify bidders, and running the auction at the offices of Underwood Murray, P.A. or such other location that may be designated by the Debtors;

    h.    Communicate regularly with Debtors and their professional advisors in connection with the status of its efforts; and

    i.    Work with the Debtors' attorneys responsible for the implementation of the proposed Transactions, reviewing documents, negotiating and assisting in resolving problems which may arise.

15.    **Term**: Subject to the approval of the Bankruptcy Court, the term of Keen's retention is from the effective date of the Application through the closing of all Transactions contemplated by this Retention Agreement or for a period of twelve (12) months, whichever comes first, which term can be extended pursuant to the same terms and conditions and by the mutual consent of the parties without the need for further application to the Bankruptcy Court. The Debtors' entry into the Retention Agreement does not obligate the Debtors to sell any Property, the sale of which (and sales price) shall be in the Debtors' sole discretion.

16.    **Indemnification**: Subject to Order of the Bankruptcy Court approving Keen's retention, the Debtors agree to defend, indemnify and hold harmless Keen and its affiliates, and its respective directors, officers, employees, agents, representatives and controlling persons, as more fully set forth in Section XI of the Retention Agreement. The Indemnification Provisions were

---

[3] As defined in the Retention Agreement.

Case 8:21-bk-03854-MGW    Doc 7    Filed 07/23/21    Page 5 of 29

negotiated between the Debtors, and Keen and the Debtors respectfully submit that the terms are reasonable and in the best interests of the Debtors, their estates and their creditors.

17.    **Exclusivity**: The Retention Agreement includes the following exclusivity language: "Broker shall have the sole and exclusive authority to represent [Debtors], on an exclusive right to sell basis, in the negotiation of Transactions." (Retention Agreement, p. 2.)

1.    <u>Timing of Payment.</u> Subject to any Order of the Bankruptcy Court, all Transaction Fees and outstanding reasonable out of pocket expense shall be paid, in full, off the top, from the Transaction proceeds or otherwise, simultaneously with the closing or other consummation of each Transaction. Subject to any Order of the Bankruptcy Court, the Debtors authorize any escrow agent or counsel (without need for further authorization or permission) to pay Broker its fees earned in strict compliance with the provisions of this Agreement, time being of the essence, directly from the proceeds of the Transaction, in full, simultaneously with the closing or other consummation of the Transaction.

2.    <u>Expenses.</u> In addition to the Transaction Fee, Debtors shall also reimburse the Broker for any outstanding, reasonable out of pocket expenses, as set forth below:

a)    All reasonable out of pocket costs and expenses incurred by Broker in connection with performing the services required by this Agreement, including but not limited to travel, lodging, FedEx, UPS or other overnight carrier, postage, photocopying charges, and the fees and reasonable expenses of counsel, etc., shall be borne by Debtors.

b)    With regards to the marketing of a Property, Broker shall prepare a marketing plan and budget, not to exceed $25,000 per property.[4] Following Debtors' approval of the budget and entry of an Order from the Bankruptcy Court authorizing such payment, Debtors shall advance to Broker the budgeted amount and Debtors agree to pay all approved, reasonable, additional costs and expenses within five (5) business days of the proper presentation of an invoice. Broker shall be under no obligation to incur marketing expenses until such time as Broker receives funds from Debtors.

c)    Broker shall not be responsible for any out-of-pocket due diligence costs and expenses, if any, including but not limited to updating

---

[4] Presently the FICO Debtor does not intend to include the Lake Wales property in the Retention Agreement, without prejudice to FICO including it at a later date.

appraisals, title reports, surveys, environmental reports, property condition assessments, etc.

18.     Keen is being employed by the Debtors pursuant to §§ 327(a) and 328(a) of the Bankruptcy Code to provide real estate brokerage services. It is standard practice in Keen's industry for professionals providing services relating to the sale of real property on a flat fee percentage basis, rather than on an incremental hourly basis, for such services.

19.     The Debtors propose that for all services, if and when the Debtors seek Court approval for a Transaction monetizing the value of one or more of the Debtors' assets pursuant to the terms of the Retention Agreement, the Debtors shall, as part of that application to the Court, seek approval of the payment of Keen's fees. Upon such approval by the Court, Keen shall be paid its Transaction Fee directly from the proceeds of the Transaction, in full, off-the-top (prior to disbursements to creditors), simultaneously with the closing or other consummation of such Transaction.

20.     Other than the $25,000 marketing costs per Property subject to the Retention Agreement, which will be authorized upon an order approving this Application, Keen shall apply for reimbursement of all other expenses in accordance with the procedures set forth in §§ 330 and 331 of the Bankruptcy Code, applicable Bankruptcy Rules, Local Rules, and orders of the Court, and such other procedures as may be fixed by order of this Court.

21.     The Debtors believe that the compensation identified above is reasonable and, therefore, should be approved by the Court.

22.     To the best of Debtors' knowledge, except as set forth in the Declaration of Harold Bordwin in Support of the Debtor's Application for Order Authorizing Employment of Keen Summit Capital Partners, LLC as Real Estate Broker, attached as **Exhibit B** (the "**Bordwin Declaration**"), neither Mr. Harold Bordwin, nor anyone in his office has any connection with the

creditors or other parties in interest or their respective attorneys.  As set forth in the Bordwin

Declaration, to the best knowledge of Mr. Bordwin neither the Broker nor Mr. Bordwin represents

any interest adverse to the Debtor.

23.    Attached to this Application is the Bordwin Declaration containing a verified

statement as required under Rule 2014 of the Federal Rules of Bankruptcy Procedure

demonstrating that under these circumstances Mr. Bordwin and the Broker are disinterested as

required by § 327(a) of the Bankruptcy Code.

24.    Accordingly, the Debtors seek authority to employ Keen on an interim basis

pending expiration of the 21-day period imposed by Federal Rule of Bankruptcy Procedure 6003,

and on a final basis upon expiration of the 21-day period.

**WHEREFORE**, the Debtors respectfully request this Court enter an Order approving the

Application and the Debtors' employment of Keen as real estate broker pursuant to the terms

contained in Exhibit A, authorizing the Debtors to commence marketing efforts to sell the

Properties and to use estate funds to fund these efforts, and granting any further or additional relief

this Court deems necessary or appropriate.

Dared: July 23, 2021.

Respectfully submitted,

/s/ Megan W. Murray
Scott A. Underwood
Florida Bar Number 0730041
Megan W. Murray
Florida Bar Number 0093922
Adam M. Gilbert
Florida Bar Number 1011637
UNDERWOOD MURRAY, P.A.
Regions Building
100 N Tampa St. Suite 2325
Tampa, FL 33602
Tel: (813) 540-8401 / Fax: (813) 553-5345

Email: sunderwood@underwoodmurray.com
mmurray@underwoodmurray.com
agilbert@underwoodmurray.com
*Proposed Counsel to the Debtors*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and accurate copy of the foregoing, that was filed with the Clerk of Court, has been furnished electronically to those parties registered to receive service via CM/ECF, on July 23, 2021 including the United States Trustee, who is registered to receive electronic notices in this case, and via First Class U.S. Mail to the United States Trustee at the below address and all those listed on the attached Matrix.

United States Trustee
Timberlake Annex, Suite 1200
501 East Polk Street
Tampa, FL 33602

/s/ Megan W. Murray
Megan W. Murray, Esq.

# EXHIBIT A

RETENTION AGREEMENT

*Between*
Parusa Investment Corp. and FICO Financial Corp.

*and*
Keen-Summit Capital Partners LLC

July 23, 2021

In consideration of the mutual agreements herein contained, "Company" (as defined below) hereby retains "Keen" (as defined below) to act as Company's real estate advisor upon the terms and conditions set forth herein.

I.      Definitions

The following terms as used herein have the following meanings.

A.      "Company" means Parusa Investment Corp. and FICO Financial Corp., jointly and severally.

B.      "Effective Date" means the date of mutual execution of this Agreement.

C.      "Gross Proceeds" means the sum of the total consideration transferred to, or for the benefit of, Company and shall be inclusive of, but not limited to, cash or its equivalent, value of debt assumed or released, liabilities assumed or released, forfeited deposits, and any other consideration, paid or payable, directly or indirectly, in connection with a Transaction.  The computation of Gross Proceeds as well as the computation of Keen's fee shall not be affected by the costs of advertising, Company's legal fees, break-up fees, Keen's expenses nor any closing costs and/or adjustments, including but not limited to adjustments and/or payments of whatever kind to lienholders, secured parties or offerors.

D.      "Keen" means Keen-Summit Capital Partners LLC.

E.      "Order" shall mean, if and when Company files for protection pursuant to Chapter 11 of the United States Bankruptcy Code, then an Order issued by the Bankruptcy Court approving Company's assumption of this Agreement, or alternatively Order Approving Application to Employ Keen.

F.      "Property" or "Properties" refers to, individually and collectively, as the case may be, those parcels of fee-owned, real property listed on Schedule "**A**" attached hereto and incorporated by reference.

G.      "Transaction" means any transaction involving the Company's pecuniary interests arising from or related or pertaining to Keen's services rendered under this Agreement, including, but not limited to the sale or transfer of title of to a Property.

## II.    Services

### A.    Authority

1.    Keen shall have the sole and exclusive authority to represent Company, on an exclusive right to sell basis, in the negotiation of Transactions.

2.    In order to coordinate our efforts with respect to possible Transactions, during the term of this Agreement neither the Company nor any representative thereof (other than Keen) will initiate discussions with a third party regarding a Transaction except through Keen.  If the Company, its management, or any of its professional advisors receives an inquiry regarding a Transaction, it will promptly advise Keen of such inquiry in order that Keen may evaluate the inquiry and assist the Company in any resulting negotiations.

3.    Company shall retain the complete discretion to accept or reject any proposed Transaction. The Company shall have no obligation to sell any Property.  The sale of any Property shall be in the Company's sole discretion.

### B.    Marketing Services

Keen's services may include those generally described below, as appropriate.  Keen will:

1.    On request, review pertinent documents and will consult with Company's counsel, as appropriate;

2.    Coordinate with Company the development of due diligence materials, the cost of which shall be Company's sole responsibility;

3.    Develop, subject to Company's review and approval, a marketing plan and implement each facet of the marketing plan;

4.    Communicate regularly with prospects and maintain records of communications;

5.    Solicit offers for a Transaction;

6.    Assist Company in evaluating, structuring, negotiating and implementing the terms and conditions of a proposed Transaction;

7.    Develop and implement, subject to Company's review and approval, an auction plan, including arranging auction logistics, assisting Company's counsel with auction bid procedures, assisting the Company to qualify bidders, and running the auction at the offices of Underwood Murray or such other location that may be designated by the Company;

8.    Communicate regularly with Company and its professional advisors in connection with the status of its efforts; and

9.    Work with Company's attorneys responsible for the implementation of the proposed Transactions, reviewing documents, negotiating and assisting in resolving problems which may arise.

III.   **Compensation**

A.   <u>Engagement Fee</u>: n/a.

B.   <u>Monthly Fee</u>.  n/a.

C.   <u>Transaction Fee.</u>   As and when Company closes a Transaction, whether such Transaction is completed individually or as part of a package or as part of a sale of all or a portion of Company's business or as part of a plan of reorganization, then Keen shall have earned compensation per Transaction equal to four percent (4%) of "Gross Proceeds" from the Transaction (the "Transaction Fee") plus the reimbursement of its reasonable out of pocket expenses, as set forth in Section **IV** below.  If the buyer of the Property is properly represented by a real estate broker, then Company shall pay an additional one percent (1%), which fee shall be payable to the buyer's broker.

D.   <u>Timing of Payment.</u> All Transaction Fees and expense reimbursements shall be paid, in full, off the top, from the Transaction proceeds or otherwise, simultaneously with the closing or other consummation of each Transaction.   Subject to any Order of the Bankruptcy Court, the Company hereby authorizes and instructs any escrow agent or counsel (without need for further authorization or permission) to pay Keen its fees earned in strict compliance with the provisions of this Agreement, time being of the essence, directly from the proceeds of the Transaction, in full, simultaneously with the closing or other consummation of the Transaction.   The rights provided by this paragraph and the Order approving same (as applicable) shall be deemed to supplement and not supersede other rights provided to Keen.

E.   <u>Survival</u>:  In the event Company and any third party should enter into an agreement providing for a Transaction before the expiration of this Agreement and the closing does not occur until after said expiration, then (notwithstanding whether during the Survival term Company engages another advisor to close a Transaction), Keen shall be entitled to a fee in accordance with the terms of this Agreement.  If Company, after the expiration of said period, arranges for a Transaction with a third party whom Keen solicited or otherwise introduced to a Property or introduced to the Company or with whom Keen dealt in connection with a Property or Company prior to said expiration, and the contract signing or closing takes place within twelve (12) months after said expiration, then (notwithstanding whether during the Survival term Company engages another advisor to close a Transaction), Keen shall be entitled to a fee in accordance with the terms of this Agreement.

IV.   <u>**Expenses**</u>

A.   All reasonable out of pocket costs and expenses incurred by Keen in connection with performing the services required by this Agreement, including but not limited to travel, lodging, FedEx, UPS or other overnight carrier, postage, photocopying charges, and the fees and reasonable expenses of counsel, etc., shall be borne by Company.

B.   With regards to the marketing of a Property, Keen shall prepare a marketing plan and budget not to exceed $25,000 per property.   Following Company's approval of the budget, Company shall advance to Keen the budgeted amount and agrees to pay all approved, reasonable, additional costs and expenses within five (5) business days of

the proper presentation of an invoice. Keen shall be under no obligation to incur marketing expenses until such time as Keen receives funds from Company.

C.    Keen shall not be responsible for any out-of-pocket due diligence costs and expenses, if any, including but not limited to updating appraisals, title reports, surveys, environmental reports, property condition assessments, etc.

## V.    <u>Company Responsibilities</u>

A.    Company warrants and represents that:

1.    it currently has **good and marketable title** to the Properties;

2.    that the Properties are **not subject to a mortgage or deed of trust**; and

3.    that it owns the Properties **free and clear of any liens, claims or encumbrances** that might affect its ability to transfer good and marketable title to a third party.

B.    Upon the Effective Date, Company will deliver to Keen a list of all brokers, principals, tenants or other prospects who have expressed an interest in using or acquiring a Property along with all correspondence and other records that relate to any such interest.

C.    With respect to each Property, Company warrants and represents that it will immediately inform Keen as to:

1.    any known or suspected risk of environmental hazard or contamination; and

2.    any known, existing or pending violation(s) of federal, state or local environmental laws or regulations.

Company shall have the continuing obligation to assess the accuracy of the representations contained herein and to advise Keen in writing as soon as it becomes aware of any inaccuracy, inconsistency, incompleteness or change of circumstances and to correct same. Additionally, if Company has ordered environmental reports or studies, as soon as such become available, Company will immediately provide a true and complete copy of such reports to Keen and Keen is hereby authorized to disseminate such reports to prospects.

D.    Company shall maintain the Property and shall furnish utilities and public liability insurance as well as casualty/property insurance covering the Properties. Company shall cause Keen to be covered as an Additional Insured under all policies of General Liability insurance and any Umbrella insurance policies and to waive subrogation against Keen for injury or damage insured under all such casualty and public liability insurance.

E.    Physical Conditions. Company acknowledges that Keen is not obligated to and has not made an independent investigation of the physical conditions of the Properties, including, but not limited to, the condition of any improvements on the Properties, or of any environmental matters with respect thereto, or of hazardous substances thereon, if any (collectively, the "Physical Conditions"). All documents and materials, investigations, reports and information with respect to the Physical Conditions shall be prepared by or for Company and shall be furnished to prospective purchasers on behalf

of Company, who (as between the Company and Keen) shall be solely responsible for same.  During the Covid-19 pandemic, Keen reserves the right, in its sole discretion, to determine whether or not to travel to a Property.

F.      Accurate & Complete Information:

     1.      Company shall make available to Keen all information reasonably requested by Keen for the purpose of enabling Keen to perform its obligations pursuant to this Agreement.  All information provided by Company shall be materially accurate and complete at the time it is furnished and Company shall, as soon as it becomes aware of any inaccuracy or incompleteness in any information then or later provided to Keen, promptly advise Keen in writing of such inaccuracy or incompleteness and correct the same.  In performing its services hereunder, Keen shall under all circumstances be entitled to rely upon and assume, without independent verification, the accuracy and completeness of all information that has been furnished to it by, or on behalf of, the Company and shall have no obligation to verify the accuracy or completeness of any such information and shall not be responsible for the inaccuracy or incompleteness of any information provided to Keen.

     2.      Company covenants that when Keen presents offering materials to Company for review and approval, Company will promptly and diligently review same for accuracy and completeness and will advise Keen, in writing, of any corrections or modifications.  Once Keen has revised such offering materials in a manner consistent with Company's recommendations, Company shall promptly review and approve, in writing, such offering materials before Keen disseminates same.  Keen shall be under no obligation: (A) to disseminate offering materials that it has reason to believe are inaccurate or are materially misleading, and (B) to disseminate such offering materials until such time as Keen receives Company's written approval of same.

G.      Within five (5) business days of a bankruptcy filing, Company shall file an application with the Bankruptcy Court for, and will use its best efforts to obtain, an Order. With respect to the application and Order:

     1.      Company acknowledges that this Agreement in its entirety will be attached to and made a part of Company's application to the Bankruptcy Court and will be referenced to in the Order.

     2.      The application shall seek an Order authorizing the employment of Keen as of the date of this Agreement, as professional persons pursuant to Section 327 of the Code (with compensation subject to the standard of review of Section 328(a) of the Code and not any other standard, including that provided in Section 330 of the Code).  The employment application and the Order shall be provided to Keen sufficiently in advance of their filing, and must be acceptable to Keen in its sole discretion.  In the event that the Bankruptcy Court does not enter an order acceptable to Keen, Keen shall have no further obligations under the terms of this Agreement.

3.   Company agrees that an Order approving Keen's retention incorporates by reference this entire Agreement inclusive of the below provisions even if not specifically mentioned in the Order.  Company agrees that:

a)   none of the fees payable to Keen hereunder shall constitute a "bonus" under applicable law;

b)   Keen is exempt from the requirement to keep time records (unless Keen services are being billed by the hour);

c)   Keen is exempt from the necessity of filing a fee application;

d)   Keen's fees and expenses shall be treated as administrative expense claims in the Company's bankruptcy case;

e)   Keen's fees and expenses shall be entitled to a carve-out for payment pursuant to Section 506(c) of the Bankruptcy Code;

f)   Consistent with Section 504(a) of the Bankruptcy Code, Keen may not share or agree to share any compensation or reimbursement with another person or any compensation or reimbursement received by another person under Section 502(b)(2) or 503(b)(4) of the Bankruptcy Code;

g)   The terms and conditions of this Agreement are "reasonable."  If the Order authorizing the employment of Keen is obtained, Company shall pay all fees and expenses as promptly as possible in accordance with the terms of this Agreement and the Order without the need for further application to or order of the Bankruptcy Court; and

h)   Bankruptcy Court has and shall retain core jurisdiction to hear and determine all matters arising from the implementation of this Agreement, and neither the Company nor Keen shall be required to seek authorization from any other jurisdiction with respect to the relief granted by the Order approving this Agreement.

4.   If Company obtains an order of the Bankruptcy Court authorizing financing or cash collateral use and such order requires the submission of a budget by Company delineating its post-petition expenditures, such budget shall expressly include all amounts projected to be paid to Keen pursuant to the terms of this Agreement.  In addition, any stipulation or order for financing or cash collateral use shall include all amounts to be paid to Keen pursuant to the terms of this Agreement among any carve-out to be provided professionals in the Company's bankruptcy case.

5.   The terms of Section **V.G** are solely for the benefit and protection of Keen and may be waived, in whole or in part, only by Keen.

**VI.    Miscellaneous**

A.      <u>Terms & Conditions</u>.  The terms and conditions set forth on Schedule **B** attached hereto are incorporated by reference. The provisions of this section of the Agreement shall survive the termination of this Agreement.

B.      <u>Notice</u>. Any correspondence or required notice shall be addressed as follows and shall be sent by UPS, FedEx, or similar overnight delivery service with proof of delivery, be supplemented by email, and shall be effective as of the date of actual receipt of the overnight delivery service.  Such notice shall be addressed as follows:

If to Keen, to:        Keen-Summit Capital Partners LLC
                       500 West 111 St., #6C
                       New York, NY 10025
                       ATTN: Harold Bordwin
                       Telephone: (646) 381-9201
                       Email: hbordwin@Keen-Summit.com

With a copy to:        Keen-Summit Capital Partners LLC
                       1 Huntington Quadrangle, Suite 2C04
                       Melville, NY 11747
                       ATTN: Matt Bordwin
                       Telephone: (646) 381-9202
                       Email: mbordwin@keen-summit.com

If to Company:         Parusa Investment Corp. and FICO Financial Corp.
                       500 Knights Run Ave., #914
                       Tampa, FL 33602
                       ATTN: Christophe Rothpletz
                       Telephone: 561-818-1926
                       Email: crothpletz@gmail.com

*Parusa Investment / FICO Financial*
*Keen-Summit Capital Partners LLC*
*July 23, 2021*
*Page 8 of 14*

With a copy to:      Underwood Murray PA
100 N Tampa Street, Suite 2325
Tampa, FL 33602
ATTN: Megan Murray, Esq. and Scott Underwood, Esq.
Telephone: 813-540-8401
Email: mmurray@underwoodmurray.com and
sunderwood@underwoodmurray.com

If the foregoing correctly sets forth the agreement between the Company and Keen, please sign and return the enclosed copy of this Agreement, whereupon it shall become our binding agreement.

**AGREED & ACCEPTED**
This 23rd day of July, 2021

**KEEN-SUMMIT CAPITAL PARTNERS LLC**

By: _____
Matthew Bordwin
as Managing Director

**AGREED & ACCEPTED**
This ___ day of July, 2021

**PARUSA INVESTMENT CORP.**

By: _____
Christophe Rothpletz
Title: President

**AGREED & ACCEPTED**
This ___ day of July, 2021

**FICO FINANCIAL CORP.**

By: _____
Christophe Rothpletz
Title: President

**SCHEDULE A**

**Properties**

**801 State Highway 161, Grand Prairie, TX 75051 and adjacent 2.0573 acre vacant lot**

**5850 W. Cypress Street, Tampa, Florida 33607**

**3300 Highlands Parkway, Smyrna, Georgia 30082**

**SCHEDULE B**

**TERMS & CONDITIONS**

I.    **Term of Agreement**

    A.    Subject to the approval of the Bankruptcy Court, the term of Keen's retention is from the effective date of the Application through the closing of all Transactions contemplated by this Retention Agreement or for a period of twelve (12) months following the Effective Date, whichever comes first, which term can be extended pursuant to the same terms and conditions and by the mutual consent of the parties without the need for further application to the Bankruptcy Court. Upon the filing of a bankruptcy petition, this Agreement shall be binding upon the Company only upon approval of the Bankruptcy Court.  In the event this Agreement is not so approved for any reason, then this Agreement shall be deemed to be terminated and Keen shall have an allowed *quantum meruit* claim for its services.  The provisions of this section of the Agreement shall survive the termination of this Agreement.

II.    **Announcement**.    Keen may, at its option and expense, place announcements and advertisements or otherwise publicize Keen's role (which may include the reproduction of the Company's logo and a hyperlink to the Company's web site) on Keen's internet web site and in such newspapers and periodicals and in its marketing materials as it may choose stating that Keen has acted as advisor to the Company with respect to the Transactions.

III.    **Authority**.  The parties hereto warrant and represent that this Agreement has been approved by all requisite corporate action and that the party executing this Agreement has full power and authority to do so.

IV.    **Construction**

    A.    Headings in this Agreement are for convenience only and shall not be used to interpret or construe its provisions.

    B.    This Agreement shall be construed fairly as to all parties and there shall be no presumption against the party who drafted this Agreement in the interpretation of this Agreement.  By executing or otherwise accepting this Agreement, Company and Keen acknowledge and represent that they are represented by and have consulted with legal counsel with respect to the terms and conditions contained herein.

V.    **Counterparts**.  This Agreement may be executed in two or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement. Facsimile and electronic transmission (including the email delivery of documents in Adobe PDF format) of any signed original counterpart or retransmission of any signed facsimile transmission shall be deemed the same as the delivery of the original.

VI.    **Dispute Resolution.**

    A.    <u>Choice of Law; Jury Trial</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to any principles of conflict of laws.  To the extent permitted by law, the parties to this Agreement waive

any right to trial by jury in any action, proceeding or counterclaim (whether based upon contract, tort or otherwise) related to or arising out of the engagement of Keen pursuant to, or the performance by Keen of the services contemplated by, this Agreement.

B.    <u>Attorneys' Fees</u>.  If any party to this Agreement brings an action directly or indirectly based upon this Agreement or the matters contemplated hereby against any other party, the prevailing party shall be entitled to recover from the non-prevailing party, in addition to any other appropriate amounts, its reasonable costs and expenses in connection with such proceeding, including, but not limited to, reasonable attorneys' fees and arbitration and/or court costs.

C.    **Jurisdiction**

    1.    <u>Arbitration</u>. Any controversy or claim arising out of or related or pertaining to this Agreement or the services of Keen, shall be determined by arbitration upon the initiation of either party, and shall be settled and conclusively resolved by a single, mutually-acceptable arbitrator who shall be experienced in the sale of real property.  The cost of such arbitrator shall be borne equally by the parties.  The arbitration shall be conducted under the auspices of, and subject to the rules of, the American Arbitration Association under its Arbitration Rules for the Real Estate Industry.  If the parties are unable to agree upon an arbitrator, the arbitrator shall be selected in accordance with AAA rules.  The arbitration shall be conducted in New York, New York, and the written decision of the arbitrator shall be final and binding on the parties and enforceable in any court of competent jurisdiction.    If the dispute or controversy between the parties concerns the determination or calculation of fees payable to Keen hereunder, Keen and the Company agree that the amounts in dispute shall be placed in a third party escrow account pending the outcome of the arbitration (with any amounts not in dispute being paid to Keen pursuant to the terms of this Agreement).  The provisions of this section of the Agreement shall survive the termination of this Agreement.

    **2.**    <u>Bankruptcy Court</u>.  Upon the filing of a bankruptcy petition, the Bankruptcy Court has and shall retain exclusive jurisdiction to hear and determine all matters arising from the implementation or execution of this Agreement.  Any and all issues, disputes, claims or causes of action which relate or pertain to, or result or arise from, this Agreement or Keen's services hereunder, shall be settled by the Bankruptcy Court.  The Bankruptcy Court shall be limited to awarding compensatory damages and the parties hereto hereby waive their right to seek punitive, consequential, exemplary or similar types of special damages.

D.    <u>Survival</u>.  The provisions of this section of the Agreement shall survive the termination of this Agreement.

VII.    **Electronic Communications**. The parties hereto may communicate with each other by electronic mail or otherwise transmit documents in electronic form during the course of this engagement. The parties hereto each accept the inherent risks of these forms of communication (including

the security risks of interception of or unauthorized access to such communications, the risks of corruption of such communications and the risks of viruses or other harmful devices).

VIII.    **Entire Agreement**.  This Agreement contains the entire agreement between the parties hereto, and no representations, inducements, promises or agreements, oral or otherwise, entered into prior to the execution of this Agreement will alter the covenants, agreements and undertakings herein set forth.  This Agreement shall not be modified in any manner, except by an instrument in writing executed by the parties.

IX.    **Force Majeure**.  Keen shall have no obligation to travel or engage in in-person meetings if, in the exercise of Keen's judgement, to do so would create an unacceptable risk of Covid-19 infection. Keen shall have no liability for delays, failure in performance, or damages due to acts or omissions of civil or military authorities, acts or omissions of communications carriers, acts of god, civil disturbances, epidemics, explosion, fire, fuel or energy shortages, lightning, pandemics, power surges or failures, strikes or labor disputes, telecommunications failure, war, water, or other causes beyond Keen's control whether or not similar to the foregoing.

X.    **Good Faith**.  The parties hereto shall deal with each other fairly and in good faith so as to allow each party to perform its duties and earn the benefits of this Agreement and shall not interfere, prevent or prohibit the other, in any manner, prior to or during the term of this Agreement from carrying out its duties and obligations under the Agreement.

XI.    **Indemnification**.

A.    The Company shall defend, indemnify and hold harmless Keen and its affiliates, and its respective directors, officers, employees, agents, representatives and controlling persons (Keen and each such entity or person being an "Indemnified Party") from and against any and all losses, claims, damages, expenses and liabilities (including but not limited to counsel fees and disbursements in connection with the investigation of, preparation for, or defense of any pending or threatened claim) (collectively, "Losses"), as incurred, to which such Indemnified Party may become subject, related to or arising out of activities performed by or on behalf of an Indemnified Party pursuant to this Agreement, any transactions contemplated hereby, the Indemnified Party's role in connection therewith, the Physical Conditions of the Property or Properties, and/or Company's title to the Property or Properties and/or the marketability of such title. The Company shall have no obligation to indemnify and hold harmless an Indemnified Party for any Losses found in a final judgment by a Court of competent jurisdiction to have resulted primarily from actions taken or omitted to be taken by the Indemnified Party in bad faith or from the Indemnified Party's gross negligence or willful misconduct in performing the services described.

B.    Bankruptcy Protocol: Upon Company's filing of a bankruptcy petition, notwithstanding anything to the contrary:

1.    All requests of Keen for payment of indemnity pursuant to the Engagement Letter shall be made by means of an application (interim or final as the case may be) and shall be subject to review by the Court to ensure that payment of such indemnity conforms to the terms of the Engagement Letter and is reasonable based on the circumstances of the litigation or settlement in respect of which indemnity is sought, <u>provided, however</u>, that in no event

shall Keen be indemnified in the case of its own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct;

2.      In no event shall Keen be indemnified if the Company or a representative of the estate, asserts a claim for, and a court determines by final order that such claim arose out of, Keen's own bad-faith, self-dealing, breach of fiduciary duty (if any), gross negligence or willful misconduct;

3.      In the event that Keen seeks reimbursement for attorneys' fees from the Company pursuant to the indemnity provisions in the Engagement Letter, the invoices and supporting time records from such attorneys shall be included in Keen's own applications for approval of indemnity payments (both interim and final) and such invoices and time records shall be subject to the United States Trustee's guidelines for compensation and reimbursement of expenses and the approval of the Bankruptcy Court under the standards of Sections 330 and 331 of the Bankruptcy code without regard to whether such attorney has been retained under Section 327 of the Bankruptcy Code and without regard to whether such attorney's services satisfy Section 330(a)(3)(C) of the Bankruptcy Code.

C.      The Company also agrees that Keen, its affiliates, and their respective directors, officers, employees, agents, representatives and controlling persons shall not be liable (whether directly or indirectly, in contract or tort or otherwise) to the Company or its security holders or creditors, for any matter, cause or thing related to or arising out of the engagement of Keen pursuant to, or the performance by Keen of the services contemplated by, this Agreement, except to the extent that Keen is found in a final judgment by a Court of competent jurisdiction to have acted or failed to act in bad faith or with gross negligence or willful misconduct in performing the services described in this Agreement.

D.      The provisions of this Section **XI** shall be in addition to any liability that the Company may otherwise have and shall be binding upon and inure to the benefit of any successors, assigns, heirs, and personal representatives of the Company. These provisions shall be governed by the law of the State of New York, without regard to its conflict of law principles, and shall be operative in full force and effect regardless of any termination or expiration of this Agreement.

XII.    **Multiple Clients**.  From time to time, Keen, or one of its related entities, may and shall have the right to advise or provide services to several industry participants, some of which may be competitors of the Company.  The Company, its directors and shareholders, waive any right to commence any action, suit or proceeding or make any demand, complaint or claim against Keen, its subsidiaries or affiliates, or their partners, directors, officers or other personnel, that arises out of Keen's, or one of its related entities', right to advise or provide services to industry competitors of the Company.

XIII.   **No Time Records**. The services to be provided by Keen pursuant to this Agreement are transactional in nature and except with respect to hourly fees, for which Keen will maintain contemporaneous time records in half-hour increments and not on a project category basis, Keen will not be billing Company by the hour nor keeping a record of its time spent on behalf of Company.

XIV.  **Relationship**.

    A.    Keen's role shall be as the Company's agent and Keen hereby acknowledges its fiduciary responsibilities to Company. Nevertheless, Company shall remain fully responsible for all decisions and matters as to which Keen's advice is sought.  Keen is assuming no management responsibilities.  Company acknowledges and agrees that its engagement of Keen hereunder does not and is not intended to confer rights upon any person not a party hereto, including but not limited to any security holders or creditors of Company's bankruptcy estate.

    B.    Keen's duties hereunder run solely to the Company. All advice, written or oral, provided by Keen to the Company pursuant to this Agreement is intended solely for the use and benefit of the Company, which agrees that such advice may not be disclosed publicly or made available to third parties without the prior written consent of Keen. Keen may condition the granting of such prior written consent upon obtaining a non-reliance letter and release from any such third parties.

    C.    The provisions of this section of the Agreement shall survive the termination of this Agreement.

XV.  **Successors and Assigns/Change of Control**.  Upon the commencement of this Agreement, it shall be binding upon and shall inure to the benefit of the parties hereto, their successors and assigns.  The Company's obligations hereunder shall survive any change in control or ownership of the Company.  In the event the proceeding is converted from the Chapter 11 to Chapter 7, this Agreement shall remain in full force and effect.  The provisions of this section of the Agreement shall survive the termination of this Agreement.

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**www.flmb.uscourts.gov**

| | |
|---|---|
| In re | Chapter 11 |
| FICO FINANCIAL CORPORATION | Case No. 8:21-bk-03853 |
| PARUSA INVESTMENT CORPORATION | Case No. 8:21-bk-03854 |
| Debtors | *Joint Administration Pending* |

_____/

**DECLARATION OF MATTHEW BORDWIN IN**
**SUPPORT OF DEBTORS' APPLICATION TO EMPLOY**
**KEEN SUMMIT CAPITAL PARTNERS, LLC AS REAL ESTATE BROKER AND**
**AUTHORIZE USE OF PROPERTY OF THE ESTATE OUTSIDE ORDINARY COURSE**

1.      My name is Matthew Bordwin and I am the Principal and Managing Director of Keen Summit Capital Partners, LLC ("**Applicant**" or "**Keen**").

2.      I am familiar with the matters set forth herein and make this *Declaration of Matthew Bordwin as Real Estate Broker* (the "**Declaration**") in support of Application to Employ Keen Summit Capital Partners, LLC as Real Estate Broker and Authorize Use of Property of the Estate Outside the Ordinary Course (the "**Application**").

3.      I have been employed by Keen since its formation on January 1, 2015, and by one or another of its predecessor firms since 1996, 25 years ago.  Keen is the successor entity to Keen Realty Consultants Inc., a workout and advisory business that was founded by my father in 1982, 39 years ago.

4.      Keen has extensive expertise in providing real estate and lease transaction services (i.e., lease renegotiations and lease restructuring services, accelerated sales of real estate and leases via real estate brokerage, auction and/or M&A processes), and corporate finance and strategic advisory services (i.e., distressed sell-side M&A services and capital raises). With a particular

expertise in workouts and restructurings, Keen represents, among others, businesses in and out of chapter 11 as well as chapter 7 trustees, shareholders, lenders, property owners, retail and commercial tenants, investors, developers, creditors and other stakeholders across numerous industries.

5.     In connection with these chapter 11 cases, the Debtors have requested Court authorization to retain Keen as its real estate broker to market and sell some or all of the Debtors' Properties (as defined in the Application). In this capacity, the professional services that Keen will provide to the Debtors will be focused on marketing the Debtors' real properties in Texas, Florida and Georgia as set forth in the Retention Agreement, attached to the Application as Exhibit A.[1]

6.     Keen is willing to act on behalf of the Debtors and to subject itself to the jurisdiction and supervision of the Court. Additionally, Keen will coordinate with the other retained professionals in these bankruptcy cases to eliminate unnecessary duplication or overlap of work.

7.     As set forth more fully in the Retention Agreement, and subject in its entirety to the terms set forth therein, Keen has agreed to accept compensation (subject to § 328(a) review) and expense reimbursement (subject to § 330 review) as follows:

- Reimbursement of up to $25,000 per Property for marketing related expenses, to be paid up front, as authorized by Court order authorizing the retention of Keen.

plus the following, subject to further Court review and approval:

- Four percent (4%) of Gross Proceeds from the Transaction; If the buyer of a Property is properly represented by a real estate broker, then Company shall pay an additional one percent (1%), which fee shall be payable to the buyer's broker.

- Any other out reasonable out of pocket costs and expenses associated with its retention.

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Application.

8.      The above-referenced compensation and reimbursement provisions have been agreed upon by the parties in anticipation that a substantial commitment of professional time and effort will be required of Keen, which may foreclose other opportunities for Keen and that the actual time and commitment required of Keen may vary substantially from week to week or month to month, creating "peak load" issues.

9.      In connection with the preparation of this Declaration, Keen conducted a review of its contacts with the Debtors that were made reasonably known to Keen. Keen does not have a formal conflict check database. As a principal of Keen and its predecessor business, I am aware of Keen's business contacts and connections. I personally reviewed the Debtors' proposed schedules and, based upon my personal knowledge noted herein regarding Keen's and its predecessor's contacts and connection, there are no persons or entities listed with whom, to the best of my knowledge, we have some connection.

10.      To the best of my knowledge, information and belief, neither I nor Keen has had or presently have any connection with creditors of the Debtors' estates, their respective attorneys and accountants, the United States Trustee, any person employed by the United States Trustee, or any other interested party in these bankruptcy cases except as set forth below:

       a.      Debtors' counsel (both Scott Underwood and Megan Murray) and David Levy served, or currently serve, on the same American Bankruptcy Institute Real Estate Committee.

11.      In the ordinary course of business, Keen has or may reasonably expect to have in the future, professional relationships with the professional law firms, accounting firms, or other professional firms or other parties in this case. All of those relationships are or are expected to be unrelated to this case.

12.     Keen is a subsidiary of Summit Capital Management LLC ("**Summit**"). Summit is primarily in the business of buying debt from secured creditors in arms-length transactions. This affidavit of disinterestedness is not on behalf of Summit. Further, Summit does not have a formal conflicts data base. However, the Debtors' draft schedules were provided to the founder and Chief Executive Officer, Chief Operating Officer, and General Counsel of Summit. After due inquiry by these officers of Summit, who have intimate knowledge of and involvement in the business of Summit, they provided to me the following disclosures: Summit has no connections with Debtors other than with Bank of America, Cadence Bank and BB&T, which business dealings were wholly unrelated to these Debtors and these bankruptcy proceedings.

13.     There are no other entities in the Keen corporate structure.

14.     These procedures are the normal process for Keen and Summit to review their records for contacts and connections.

15.     Except for the proposed employment by the Debtor, neither I nor Keen has or will represent any other entity in connection with this case, and neither I nor Keen will accept any fee from any other party or parties in this case.

16.     As of the filing of the Application, Keen has no outstanding claims against the Debtors for work performed prior to the filing of the petition and had no claim against the Debtors as of the filing of the petition.

17.     Keen represents no adverse interest to the Debtors, and both Keen and I are "disinterested persons" as that term is defined under 11 U.S.C. § 101(14) and as required for retention as broker to the Debtors by 11 U.S.C. § 327 and Bankruptcy Rule 2014.

18.     Except as disclosed in the Application, neither I, nor Keen, have any agreement with any other entity to share with such entity any compensation received by Keen in connection with this chapter 11 case.

19.     The factual statements set forth herein are made based on personal review by me of the list of creditors of the Debtors, and a search of Keen's client list, neither of which revealed any conflicts.

20.     If I discover any information that is contrary or pertinent to statements made herein, I will promptly disclose such information to this Court by filing and serving a supplemental affidavit on all parties who have filed a notice of appearance in this case.

**Pursuant to 28 U.S.C. §1746, I certify under penalty of perjury that the foregoing is true and correct.**

Dated: July 23, 2021                              By:     */s/ Matthew Bordwin*                    
                                                         Matthew Bordwin
                                                         Principal and Managing Director
                                                         Keen-Summit Capital Partners LLC
                                                         1 Huntington Quadrangle, Suite 2C04
                                                         Melville, NY 11747
                                                         Telephone: (646) 381-9202