# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION
### www.flmb.uscourts.gov

| | |
|---|---|
| In re | Chapter 11 |
| PARUSA INVESTMENT CORPORATION | Case No. 8:21-bk-03854-MGW |
| | *Jointly Administered* |
| FICO FINANCIAL CORPORATION | Case No. 8:21-bk-03853-MGW |
| Debtors. | |

_____/

## PARUSA INVESTMENT CORPORATION AND FICO FINANCIAL CORPORATION'S JOINT DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF REORGANIZATION

November 8, 2021

/s/ Scott A. Underwood
Scott A. Underwood
Florida Bar Number 0730041
Megan W. Murray
Florida Bar Number 0093922
Adam M. Gilbert
Florida Bar Number 1011637
UNDERWOOD MURRAY P.A.
100 N Tampa St. Suite 2325
Tampa, FL 33602
Tel: (813) 540-8401
Email: sunderwood@underwoodmurray.com
        mmurray@underwoodmurray.com
        agilbert@underwoodmurray.com
*Counsel to the Debtors*

## PRELIMINARY STATEMENT

This Disclosure Statement ("**Disclosure Statement**") is submitted pursuant to § 1125 of the Bankruptcy Code in connection Parusa Investment Corporation and FICO Financial Corporation's ("**Debtors**") Joint Plan of Reorganization.  All capitalized and undefined terms used herein shall have the same meaning ascribed to such term in the Plan.   The Disclosure Statement includes the following exhibits:

**Exhibit A: Debtors' Joint Plan of Reorganization**


**APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

**NO STATEMENT OR INFORMATION CONCERNING THE DEBTORS (PARTICULARLY AS TO FINANCIAL CONDITION OR WITH RESPECT TO DISTRIBUTIONS TO BE MADE UNDER THE PLAN) OR ANY OF THEIR ASSETS THAT ARE GIVEN FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN IS AUTHORIZED, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. THE STATEMENTS AND INFORMATION ABOUT THE DEBTORS AND THE FINANCIAL INFORMATION OF THE DEBTORS, INCLUDING ALL INFORMATION REGARDING CLAIMS OR INTERESTS CONTAINED HEREIN, HAVE BEEN PREPARED FROM DOCUMENTS AND INFORMATION PREPARED BY THE DEBTORS OR BY PERSONS CONNECTED TO THE DEBTORS.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND NEITHER DELIVERY OF THIS DISCLOSURE STATEMENT NOR ANY EXCHANGE OF RIGHTS MADE IN CONNECTION WITH THE PLAN SHALL, UNDER ANY CIRCUMSTANCES, CREATE AN INFERENCE THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION SET FORTH HEREIN SINCE THE DATE OF THE DISCLOSURE STATEMENT AND THE MATERIALS THAT WERE RELIED UPON IN PREPARATION OF THE DISCLOSURE STATEMENT WERE COMPILED.**

**THIS DISCLOSURE STATEMENT MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE IN FAVOR OF OR AGAINST THE PLAN, AND NOTHING CONTAINED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED EVIDENCE OF THE TAX OR OTHER LEGAL CONSEQUENCES OR EFFECTS OF THE LIQUIDATION OF THE DEBTORS.  CERTAIN INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, BY ITS NATURE, IS A FORECAST OF FUTURE EVENTS AND THEREFORE INCLUDES ESTIMATES, ASSUMPTIONS AND PROJECTIONS WHICH MAY PROVE TO BE WRONG, OR WHICH MAY BE MATERIALLY DIFFERENT FROM ACTUAL FUTURE RESULTS.**

**EACH HOLDER OF A CLAIM SHOULD CONSULT SUCH HOLDER'S ATTORNEY AND ACCOUNTANT AS TO THE EFFECT OF THE PLAN ON SUCH HOLDER, INCLUDING, BUT NOT LIMITED TO, THE TAX EFFECTS OF THE PLAN AND RECEIVING LESS THAN FULL PAYMENT ON A CLAIM OR RECEIVING PAYMENT AFTER CLAIMING A LOSS ON ACCOUNT OF SUCH CLAIM. THIS DISCLOSURE STATEMENT IS NOT MEANT TO PROVIDE ANY TAX ADVICE AND EXPRESSLY DISCLAIMS SUCH TAX ADVICE.**

## ARTICLE I - OVERVIEW OF THE PLAN

The following is a summary of certain information contained elsewhere in this Disclosure Statement and the Plan. The summary is necessarily incomplete and is qualified in its entirety by reference to the more detailed information appearing elsewhere in this Disclosure Statement and the Plan.

The Plan is the product of efforts by the Debtors and their professionals to design a single Plan for the Estates that is fair and equitable to all parties in interest. Consistent with these objectives, the Debtors believe that, considering all the facts and circumstances underlying the Bankruptcy Case, the Plan provides for the maximum, expeditious and equitable treatment of holders of all Claims.

The essential elements of the Plan include, among other things:

(a) The Debtors will market and sell some or all of the Debtors' Properties located in Florida, Texas and Georgia in amounts necessary to fulfill all elements of the Plan. The Debtors intend to sell the Properties through a structured sale process, with a goal of initial closing or closings to occur no later than December 31, 2021. The Net Sale Proceeds from the sale of the Debtors' Properties will be used to fund the Debtors' Plan and pay or reserve for all Allowed Claims, following payment of all administrative claims, including but not limited to all federal and state tax liabilities, whether pass through to parent entities (indirect) or direct, and accruing post-petition in any form, including but not limited to income, appreciation, or capital gains.

(b) Proceeds from the sale of the Properties will pay or reserve for all Allowed Claims on the Effective Date, as set forth below. Principally, the Debtors intend to reserve funds necessary to pay Parusa's largest disputed creditor, Xavier Bestenheider, who currently asserts a disputed, unsecured jury verdict award in the approximate amount of $5,565,786.80, plus prejudgment interest and fees. The Debtors intend to appeal this award but reserve all amounts necessary to pay this claim in full, if necessary, following a final Court Order at the resolution of the State Court Case.

(c) The Debtors believe that the collective value of the Properties is far more than sufficient to pay all Allowed Claims in full, even if the Debtors are ultimately required to pay the award listed in section (b) above.

(d) Creditors will be paid according to the priority scheme established by the Bankruptcy Code.

# ARTICLE II

## DEFINITIONS

Unless the context otherwise requires, the following terms shall have the following meanings when used in initially capitalized form in the Plan or Disclosure Statement (as hereinafter defined). Such meanings shall be equally applicable to both the singular and plural forms of such terms. Any term used in capitalized form that is not defined in the Plan or Disclosure Statement but that is defined in the Bankruptcy Code or Bankruptcy Rules (as such terms are hereinafter defined) shall have the meaning ascribed to such term in the Bankruptcy Code or Bankruptcy Rules. The rules of construction set forth in § 102 of the Bankruptcy Code shall apply in construction of the Plan.

2.1     "Administrative Claim" means any Claim for the payment of any Administrative Expense.

2.2     "Administrative Expense" or "Administrative Expense Claim" means any cost or expense of administration of the Bankruptcy Case under § 503(b) of the Bankruptcy Code.

2.3     "Allowed" means as authorized by the Bankruptcy Court.

2.4     "Allowed Claim" means and includes any Claim (other than a Disputed Claim), proof of which was timely filed or, by Order of the Bankruptcy Court, was not required to be filed or (b) any Claim (other than a Disputed Claim) that is listed in the Schedules as liquidated in amount and not disputed or contingent, and, in each such case in (a) and (b) herein, as to which either (1) no objection to the allowance thereof has been or may be filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, unless the Claim has been Allowed by a Final Order of the Bankruptcy Court (but only to the extent so Allowed) and (2) such Claim is not subject to further appeal in a Court other than the Bankruptcy Court.

2.5     "Allowed Amount" means the dollar amount of an Allowed Claim.

2.6     "Auction" means the planned Auction for December 2, 2021.

2.7     "Avoidance Actions" means Causes of Action under §§ 544, 547, 548 and under the expanded time limits of 11 U.S.C. § 544(b) and 26 U.S.C. § 6502.

2.8     "Bankruptcy Case" means the above-captioned chapter 11 cases for the Debtors that were filed on the Petition Date and which the Debtors will be seeking to jointly administer.

2.9     "Bankruptcy Code" means title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*., as in effect on the Petition Date, together with all amendments and modifications to the extent applicable to the Bankruptcy Case.

2.10     "Bankruptcy Court" means either the United States Bankruptcy Court for the Middle District of Florida, Tampa Division, having jurisdiction over the Bankruptcy Case or, to the extent the reference is withdrawn, the District Court.

2.11    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as applicable to the Bankruptcy Case, together with all amendments and modifications to the extent applicable to the Bankruptcy Case.

2.12    "Bestenheider" means Xavier Bestenheider, a Plaintiff in the State Court Case, and also individually and as assignee and / or successor in interest, as referenced in proofs of claim filed in both Debtors' cases.  The Debtors' reference to Bestenheider shall not be construed to consent to, acknowledge or agree that he is properly acting on behalf of or as successor to another.

2.13    "Bid Procedures" means those bidding procedures a approved (at Doc. No. 99) by the Court on October 13, 2021, to facilitate the Auction.

2.14    Bid Procedures Order" means that order approved by the Court on October 13, 2021 approving the Bid Procedures (Doc. No. 099).

2.15    "Business Day" means any day other than a Saturday, Sunday or legal holiday (as such term is defined in Bankruptcy Rule 9006(a)).

2.16    "Cash" means lawful currency of the United States of America and its equivalents.

2.17    "Causes of Action" means any and all of the Debtors' or Estates' actions, claims, demands, rights, defenses, counterclaims, appeals, suits and causes of action, whether known or unknown, in law, equity or otherwise, against any creditor or other third party, including any reference to "potential claim" and any claims under Chapter 5 of the United States Bankruptcy Code an any and all other claims or rights or proceedings of any value whatsoever, at law or in equity, turnover actions and claims of the type referred to in the Disclosure Statement or in the Plan.  When used herein, the term "Causes of Action" shall not include any claims, obligations, suits, judgments, damages, rights, remedies, causes of action, charges, costs, debts, indebtedness, or liabilities released or waived by the Debtors pursuant to a Final Order of the Bankruptcy Court. A Cause of Action shall not, under any circumstances, be waived as a result of the failure of the Debtors to describe such Cause of Action with specificity in the Plan or in the Disclosure Statement; nor shall the Debtors be estopped or precluded under any theory from pursuing such Causes of Action.  Except as waived by the terms of the Plan or Final Order of the Bankruptcy Court, nothing in the Plan operates as a release of any Cause of Action, and all Causes of Action not so released shall become Causes of Action of the Reorganized Debtors by virtue of operation of the Plan.

2.18    "Claim" means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured.  The term "Claim" shall be broadly construed herein to include all manner and type of claim, whenever and wherever such claim may arise.

2.19    "Claimant" means a party asserting a Claim.

2.20    "Class" or "Classes" means a category of Claims as classified in Article 3 of the Plan.

2.21    "Confirmation" or "Confirmation of the Plan" means the entry by the Bankruptcy Court of the Confirmation Order.

2.22    "Confirmation Date" means the date on which the Confirmation Order becomes a Final Order.

2.23    "Confirmation Hearing" means the hearing(s) which shall be held before the Bankruptcy Court in which the Debtors shall seek Confirmation of the Plan.

2.24    "Confirmation Order" means the Order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

2.25    "Cure Amount" mean, as set forth in Article 5, the amount that any tenant of the Debtor (or executory contract holder) believes is necessary to assume its lease or contract pursuant to § 365 of the Bankruptcy Code. Any such objection related to the assumption and assignment of a contract or lease or to a Cure Amount (to be filed on or before November 12, 2021) must state with specificity what Cure Amount the tenant or contract party believes is required with appropriate documentation in support thereof.

2.26    "Debtors" mean collectively Parusa Investment Corp., and FICO Financial Corp., who filed their chapter 11 bankruptcy petitions on the Petition Date.

2.27    "Disallowed" means, with respect to any Claim or Interest or portion thereof, any Claim against or Interest in the Debtors which: (1) has been disallowed, in whole or part, by a Final Order of the Bankruptcy Court; (2) has been withdrawn by agreement of the Debtor(s) and the Holder thereof, in whole or in part; (3) has been withdrawn, in whole or in part, by the Holder thereof; (4) if listed in the schedules as zero or as disputed, contingent or unliquidated and in respect of which a proof of claim has not been timely filed or deemed timely filed pursuant to this Plan, the Bankruptcy Code or any Final Order of the Bankruptcy Court or other applicable bankruptcy law; (5) has been reclassified, expunged, subordinated or estimated to the extent that such reclassification, expungement, subordination or estimation results in a reduction in the filed amount of any proof of claim or proof of interest; or (6) is evidenced by a proof of claim or a proof of interest which has been filed, or which has been deemed to be filed under applicable law or order of the Bankruptcy Court or which is required to be filed by order of the Bankruptcy Court but as to which such proof of claim or proof of interest was not timely or properly filed. In each case a Disallowed Claim or Interest is disallowed only to the extent of disallowance, withdrawal, reclassification, expungement, subordination or estimation.

2.28    "Disclosure Statement" means this Disclosure Statement associated with the Debtors' Plan, including all exhibits and schedules attached thereto or referenced therein (and the exhibits, if any, to such annexes, exhibits and schedules), prepared pursuant to § 1125 of the Bankruptcy Code and approved by the Bankruptcy Court, as such Disclosure Statement may be further amended or modified from time to time.

2.29    "Disclosure Statement Approval Order" means the order approving the Disclosure Statement and authorizing solicitation of the Plan.

2.30    "Disputed Claim" means a Claim that has not been Allowed by a Final Order of the Bankruptcy Court as to which (a) a Proof of Claim has been filed with the Bankruptcy Court, or is deemed filed under applicable law or Order of the Bankruptcy Court and (b) an objection to the allowance thereof has been or may be filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court and any such objection has not been (1) withdrawn, (2) overruled or denied in whole or part by a Final Order of the Bankruptcy Court or (3) granted in whole or part by a Final Order of the Bankruptcy Court. For purposes of the Plan, a Claim that has not been Allowed by a Final Order of the Bankruptcy Court shall also be considered a Disputed Claim, whether or not an objection has been or may be filed within the applicable period of limitation fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, if (A) the amount of the Claim specified in the Proof of Claim exceeds the amount of any corresponding Claim scheduled in the Schedules, (B) the classification of the Claim specified in the Proof of Claim differs from the classification of any corresponding Claim scheduled in the Schedules, (C) no corresponding Claim has been scheduled in the Schedules, (D) such Claim is reflected as unliquidated or contingent in the Proof of Claim filed in respect thereof, or (E) such Claim is listed as disputed by the Debtors.

2.31    "Disputed Claims Reserve" is defined in Section 5.6(c) below.

2.32    "Distribution" means any distribution pursuant to the Plan and Disclosure Statement to Holders of Allowed Claims.

2.33    "District Court" means the United States District Court for the Middle District of Florida, or the unit thereof having jurisdiction over the matter in question.

2.34    "Effective Date" means the date following which all conditions precedent have been met in accordance with Article 11 of the Plan.

2.35    "Equity Interest" means the equity in the Debtors or the Reorganized Debtors as provided for in the Plan.

2.36    "Estate" means the estate of each Debtor created by § 541 of the Bankruptcy Code upon the commencement of each Bankruptcy Case, and when used collectively for both Debtors and Reorganized Debtor before and after confirmation, the "Estates."

2.37    "Executory Contract" means a contract to which the Debtor is a party that is subject to assumption or rejection under Section 365 of the Bankruptcy Code.

2.38    "FICO" means FICO Financial Corporation.

2.39    "Final Order" means an Order, the implementation, operation or effect of which has not been stayed and as to which Order (or any revision, modification or amendment thereof) the time to appeal or seek review or rehearing or writ of certiorari has expired and as to which no appeal or petition for review or rehearing or certiorari has been taken and is pending.

2.40    "General Claims Bar Date" is defined in Section 2.6.

2.41    "General Unsecured Claim" means Unsecured Claim not otherwise classified.

2.42    "Governmental Unit Claims Bar Date" is defined in Section 3.6.

2.43    "Governmental Unit" means any foreign, provincial, federal, state, local or municipal (a) government, (b) governmental agency, (c) governmental commission, (d) governmental department, (e) governmental bureau, (f) governmental ministry or (g) governmental entity.

2.44    "Holder" means the legal or beneficial holder of a Claim or Interest (and, when used in conjunction with a Class or type of Claim or Interest, means a Holder of a Claim or Interest in such Class or of such type).

2.45    "Impaired" refers to any Claim or Equity Interest that is impaired within the meaning of § 1124 of the Bankruptcy Code.

2.46    "Lien" means the meaning ascribed to such term in § 101(37) of the Bankruptcy Code.

2.47    "Net Cash Flow" means the operating revenue less the operating expenses (including but not limited to all federal or state income tax liability, whether direct or pass through, consolidated or individual basis) for each Debtor, which shall be determined by the Debtor or Reorganized Debtor in its sole business discretion.

2.48    "Net Sale Proceeds" means the amount of Cash paid to each of the Reorganized Debtors through the sale of one or more of each of the Debtors' Properties, less selling costs associated with the sale of such units, including without limitation, real estate commissions, pro-ration of property taxes and utilities, transfer taxes (if applicable), excise taxes, any other form of federal or state tax liability, (whether pass through to parent entities or direct, and accruing pre or post-petition in any form, including but not limited to income, appreciation, or capital gains taxes), title fees, escrow fees and closing costs. The Net Sale Proceeds shall be allocated to each Debtor respectively based on its proportionate share and allocation of income and expenses, and all income and expenses attributable to both Debtors shall be allocated in accordance with fair accounting standards under GAAP or otherwise.

2.49    "Order" means an order or judgment of a court.

2.50    "Person" means any person, individual, partnership, corporation, limited liability company, joint venture company, association or other entity of whatever kind, whether or not for profit, including, but not limited to, any "person" as such term is defined in § 101(41) of the Bankruptcy Code, but excluding any Governmental Unit.

2.51    "Parusa" means Parusa Investment Corporation.

2.52    "Petition Date" means July 23, 2021, for both Debtors.

2.53    "Plaintiffs" means Xavier Bestenheider and Sixta Financial, Inc., the Plaintiffs in the State Court Case.

2.54    "Plan" means the Debtors' plan under Chapter 11 of the United States Bankruptcy Code, including any exhibits and other attachments hereto, as it and they may be amended, modified or supplemented from time to time.

2.55    "Priority Claims" means a Claim entitled to priority under Section 507 of the Bankruptcy Code, other than an Administrative Claim or a Priority Tax Claim.

2.56    "Priority Tax Claim" means any Claim of a Governmental Unit entitled to priority of payment under section 507(a)(8) of the Bankruptcy Code.

2.57    "Professional" means any entity retained by order of the Bankruptcy Court in connection with this chapter 11 case pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code, including any entity retained pursuant to an order of the Bankruptcy Court authorizing the retention of "ordinary-course professionals."

2.58    "Proof of Claim" means any proof of claim filed with the Bankruptcy Court with respect to the Debtors pursuant to Bankruptcy Rules 3001 or 3002.

2.59    "Properties" means those 4 commercial properties in Texas, Georgia and Florida owned by the Debtors, as set forth in Article IV below.

2.60    "Rejecting Class" is defined in Section 3.5.

2.61    "Reorganized Debtors" means the Debtors or any successor thereto, by merger, consolidation, or otherwise, from and after the Effective Date.

2.62    "Rothpletz" means Roland Rothpletz.

2.63    "Sixta" means Sixta Financial, Inc., a Plaintiff in the State Court Case.

2.64    "Schedules" means the Schedules, Statements and Lists filed by the Debtors with the Bankruptcy Court pursuant to Bankruptcy Rule 1007, as they may be amended or supplemented from time to time.

2.65    "State Court" means the Nineteenth Judicial Circuit in and for Martin County, Florida.

2.66    "State Court Case" means the cause of action filed by Sixta and Bestenheider in the Nineteenth Judicial Circuit in and for Martin County, Florida, Case No. 2010-CA-2346.

2.67    "United States Trustee" means the office of the United States Trustee for the Middle District of Florida.

2.68    "Unexpired Lease" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

2.69    "Unimpaired" means a Claim that is unimpaired within the meaning of Section 1126 of the Bankruptcy Code.

2.70    "Unsecured Claim" means any unsecured Claim against the Debtors.

2.71    "Voting Classes" is defined in Section 3.4.

## ARTICLE III

## INTRODUCTION

3.1    <u>Purpose of this Disclosure Statement</u>.  This Disclosure Statement is submitted pursuant to § 1125 of the Bankruptcy Code, to all known holders of Claims, for the purpose of disclosing that information which the Bankruptcy Court has determined is material, important and necessary for holders of Claims to arrive at a reasonably informed decision in exercising their right to vote for acceptance or rejection of the Plan.

3.2    <u>Explanation of the Bankruptcy Case</u>.

(a)    <u>Purpose of Chapter 11</u>.  Chapter 11 of the Bankruptcy Code contemplates the formulation of a plan of reorganization or liquidation and outlines how a debtor's debts will be paid.  In addition to statutory requirements relating to plan formulation, confirmation and post-confirmation matters, a chapter 11 case is also shaped by statutory prohibitions against collection efforts or enforcement actions by creditors.  The Bankruptcy Code contains a number of other significant provisions applicable to chapter 11 cases, such as those relating to prepetition executory contracts, which confer powers on debtors and also provide creditors with certain rights and remedies.

(b)    <u>Formulation of the Plan</u>.  Formulation of a plan of reorganization or liquidation is the principal purpose of a chapter 11 case.  A chapter 11 plan sets forth the means by which claims against, and interests in, debtors will be satisfied.  After a plan has been filed, it must be accepted by holders of Claims against, or interests in, the debtor.  Section 1125 of the Bankruptcy Code requires disclosure before solicitation of acceptances of a chapter 11 plan.  This Disclosure Statement is presented to holders of Claims and Interests to satisfy the disclosure requirements of § 1125 of the Bankruptcy Code.

3.3    <u>Approval of Disclosure Statement</u>.  This Disclosure Statement is being filed at or about the same time as the Petition Date.  The Debtors anticipate the Court will conditionally approve the Disclosure Statement and set a confirmation schedule and a confirmation date accordingly.

3.4     Voting Procedures.

(a)     Only the holders of Claims and Equity Interests that are deemed "Allowed" under the Bankruptcy Code and that are "Impaired" under the terms and provisions of Article 5 of the Plan (the "Voting Classes") are permitted to vote to accept or reject the Plan.  For purposes of the Plan, only the holders of Allowed Claims in the Voting Classes (Class 2, 5) are Impaired under the Plan and thus may vote to accept or reject the Plan.

(b)     Section 1126(f) of the Bankruptcy Code provides that a Class that is not Impaired under the Plan is conclusively presumed to have accepted the Plan and that solicitation of acceptances with respect to such Class is not required.

(c)     Section 1126(g) of the Bankruptcy Code provides that Class that is not entitled to receive or retain any property under the Plan on account of such claim or interest classified in such Class is presumed to have rejected the Plan and that solicitation of acceptances with respect to such Class is not required.

(d)     Each holder of a Claim in a Voting Class should read this Disclosure Statement, together with the Plan in their entirety.  After carefully reviewing the Plan and this Disclosure Statement, please complete the enclosed Ballot, including indicating your vote thereon with respect to the Plan, and return the Ballot as provided below.  Please note that your vote and election cannot count unless you return the enclosed Ballot.

(e)     If you are a member of a Voting Class and did not receive a Ballot, if your Ballot is damaged or lost, or if you have any questions concerning voting procedures, please contact Scott A. Underwood or Megan W. Murray at (813) 540-8401 or by electronic transmission at sunderwood@underwoodmurray.com or mmurray@underwoodmurray.com

3.5     Confirmation.

(a)     Confirmation Requirements.

(i)     Acceptance of Plan and Vote Required for Class Acceptance.  As the holder of an Allowed Claim in the Voting Classes, your vote on the Plan is extremely important.  In order for the Plan to be accepted and thereafter confirmed by the Bankruptcy Court without resorting to the "cramdown" provisions of § 1129(b) of the Bankruptcy Code, votes representing at least two-thirds in amount and more than one-half in number of Allowed Claims of each Impaired Class of Claims that are voted must be cast in acceptance of the Plan.

(ii)     At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan if all the requirements of § 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the Plan be accepted by all Impaired Classes of Claims and equity interests, that members of a Class receive or retain under the Plan, property having a value not less than the amount which the Class members would have received or retained if the Debtors were liquidated under Chapter 7 on the same date, and that the Plan is feasible and not likely followed by another liquidation or reorganization process.

(b)    <u>Cramdown</u>.

(i)    Even if one or more Impaired Classes reject the Plan, the Bankruptcy Court may nonetheless confirm the Plan if the non-accepting Classes are treated in the manner prescribed by § 1129(b) of the Bankruptcy Code. A plan that binds non-accepting Classes is commonly referred to as a "cramdown" plan. The Bankruptcy Code allows the Plan to bind non-accepting Classes of Claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Bankruptcy Code, does not discriminate unfairly, and is "fair and equitable" toward each Impaired Class that has not voted to accept the Plan.

(ii)    To meet the requirement for confirmation of the Plan under the "cramdown" provisions of the Bankruptcy Code with respect to any Impaired Class of Claims or Equity Interests which votes to reject the Plan (a "Rejecting Class"), the Debtors have to show that all Classes junior to the Rejecting Class will not receive or retain any property under the Plan unless all holders of Claims in the Rejecting Class receive, under the Plan, property having a value equal to the full amount of their Allowed Claims or Allowed Equity Interests, that the Plan does not discriminate unfairly, and that the Plan is fair and equitable.

This requirement is met with respect to a class of secured claims if the Plan meets the requirements of § 1129(b)(2)(A) and holders (i) retain their liens and receive deferred Cash payments totaling at last the allowed amount of such claim of a value on the Effective Date of at least the value of the holder's interest in Estate property, (ii) for the sale of such property free and clear of liens, or (iii) for the realization by the holder of an Allowed Secured Claim of the indubitable equivalent of such claim. The Debtors believe the Plan satisfies these requirements, as there are no secured claims.

(iii)    The Bankruptcy Code requirement that a plan not "discriminate unfairly" means that a dissenting Class must be treated equally with respect to other Classes of equal rank. The Debtors believe that the Plan does not "discriminate unfairly" with respect to any Class of Claims or Equity Interests.

(iv)    The "fair and equitable" standard, also known as the "absolute priority rule," requires that a dissenting Class receive full compensation for its Allowed Claims or interests before any junior Class receives any distribution. The Debtors believe the Plan is fair and equitable to all Classes pursuant to this standard. The Debtors believe the Plan meets the requirements for Confirmation by the Bankruptcy Court, notwithstanding the non-acceptance by an Impaired Class of Claims or holders of Equity Interests. The Debtors intend to evaluate the results of the balloting to determine whether to seek "cramdown" of Confirmation of the Plan in the event that less than all the Impaired Classes of Claims do not vote to accept the Plan. The determination as to whether to seek Confirmation under such circumstances will be announced before or at the Confirmation Hearing.

(c)    <u>Confirmation Hearing</u>. The Bankruptcy Court will set a Confirmation Hearing with respect to the Plan. Each party in interest will receive, either with this Disclosure Statement or separately, the Bankruptcy Court's notice of the hearing on Confirmation of the Plan. The Confirmation Hearing may be adjourned, from time to time, by the Bankruptcy Court without

further notice except for an announcement made at the Confirmation Hearing or any adjournment thereof.

(d)    Feasibility of the Plan.  The plan contemplates the liquidation of sufficient assets of the Debtors to pay or reserve for all Allowed Claims. The Debtors believe the asset values are more than sufficient to accomplish that task.  Therefore, the Debtors believe that the Plan is feasible.

(e)    Effect of Confirmation.  Confirmation makes the Plan binding upon the Debtors, all holders of Claims and other parties in interest, regardless of whether it has been accepted by them.

3.6    Procedure for Filing Proofs of Claim.

(a)    Bar Dates.

(i)    General Bar Date for Claims.  Unless otherwise ordered by the Bankruptcy Court, all Proofs of Claim of a non-Governmental Unit must have been filed by the close of business on October 1, 2021 (the "General Claims Bar Date"). If a claim was listed in the Schedules as non-contingent, liquidated, and undisputed, a proof of claim need not have been filed. Both the Schedules and the docket listing Proofs of Claim that were filed on or before the General Claims Bar Date are on file at the Bankruptcy Court and are open for inspection during regular Bankruptcy Court hours.

(ii)    Governmental Unit Bar Date.  Unless otherwise ordered by the Bankruptcy Court all Proofs of Claim of a Governmental Unit must have been filed by the close of business on January 19, 2022 (the date which his 180 days following the Petition Date) (the "Governmental Unit Claims Bar Date").  The Debtors anticipate shortening the Governmental Unit Claims Bar Date to achieve conformation timely.  If a claim was listed in the Schedules as non-contingent, liquidated, and undisputed, a proof of claim need not have been filed.  Both the Schedules and the docket listing Proofs of Claim that were filed on or before the Governmental Unit Claims Bar Date are on file at the Bankruptcy Court and are open for inspection during regular Bankruptcy Court hours.

(iii)    Administrative Claims Bar Date.  Unless otherwise ordered by the Bankruptcy Court, the Confirmation Order will establish a bar date for Administrative Claims. Holders of Administrative Claims must file a Request for Payment of Administrative Expense on or before such bar date.

(b)    Executory Contracts and Unexpired Leases.  Unless otherwise ordered by the Bankruptcy Court, parties to Executory Contracts or unexpired leases that are rejected by the Debtors under the Plan must file Proofs of Claims for damages resulting from such rejection within thirty (30) calendar days after the Confirmation Date or be barred from asserting a claim based on such rejection.

## ARTICLE IV
## THE BANKRUPTCY CASE

4.1    History of the Debtors and Factors Precipitating the Bankruptcy Case.

Parusa Investment Corporation ("**Parusa**") is a Florida corporation located in Tampa, Florida. Parusa is owned 100% by RCC Vision, Inc., which is owned 100% by Roland Rothpletz, RCC Vision, Inc.'s sole shareholder. Parusa operates out of Tampa, Florida by its President, Christophe Rothpletz (Roland's son).

Parusa is the owner of commercial property, located at 801 State Highway 161, Grand Prairie, TX 75051 (the "**Grand Prairie Property**," which includes the lot listed below). The Grand Prairie Property is 122,000 square feet, located on five (5) acres. The building is nearly, fully leased. Parusa also owns a 2.0573-acre vacant lot at 101 State Hwy 161, Grand Prairie, TX (adjacent to the office building).

The Debtor, FICO Financial Corporation, ("**FICO**") is solely owned by Parusa, and also is operated out of Tampa, Florida by Christophe Rothpletz, its President.   FICO owns 3 commercial Properties:

1)   Commercial office building located at 5850 W Cypress Street, Tampa, Florida 33607 (the "**Tampa Property**"). This property is a 40,000 square foot office building with its largest tenant as a defense contractor which will soon be outfitted with significant high-tech improvements in connection with a 10-year renewal.

2)   East Lake Shopping Center located at 2015-2039 State Highway 60 East, Lake Wales, Florida, 33853 (the "**Lake Wales Property**"). This property is a 45,000 square feet shopping center.

3)   Commercial office building located at 3300 Highlands Parkway, Smyrna, Georgia, 30082 (the "**Smyrna Property**"). This property is a 65,000 square foot office property in an attractive area close to Atlanta (collectively the Tampa Property, the East Lake Property and the Smyrna Property are referred to as the "**FICO Properties**" and together with the Grand Prairie Properties, the "**Properties**").

4.2    The Parusa Litigation Precipitating the Bankruptcy Case

Since 2010, Parusa and its ultimate equity interest holder, Rothpletz have been embroiled in highly contested and extensive state court litigation (the "**State Court Case**") with Xavier Bestenheider ("**Bestenheider**") and Sixta Financial, Inc. ("**Sixta**" and collectively with Bestenheider the "**Plaintiffs**"). The State Court Case initially stemmed from an alleged 2003 transaction between Parusa and Jacky Bestenheider[1] for the purchase of Sixta and its assets. The State Court Case came to a head in May of 2021 when a 13-day jury trial was held. At the end of the trial, the jury found that Parusa was liable to Bestenheider in the amount of $5,565,786.80 for

---

[1] Jacky Bestenheider is a former business partner of R. Rothpletz and father of Xavier Bestenheider.

money lent and found Rothpletz was liable to Bestenheider in the amount of $500,000.00 for constructive fraud.[2]

After the entry of the verdict, Parusa filed several post-trial motions on June 18, 2021, including a Motion for Remittitur; Motion for a New Trial; and a Motion for Judgment in Accordance with Motion for Directed Verdict, or Alternatively Motion for Judgment Notwithstanding the Verdict.  On June 22, 2021, the Plaintiffs filed their Motion for Entry of Final Judgment and Prejudgment Interest ("**Motion for Final Judgment**")[3] and on October 12, 2021, Plaintiffs filed their Motion to Tax Costs (collectively with the Motion for Final Judgment, Motion for Remittitur, Motion for a New Trial, and Motion for Judgment in Accordance with Motion for Directed Verdict, or Alternatively Motion for Judgment Notwithstanding the Verdict the "**Post-Trial Motions**").  Parusa also intends to appeal the jury's verdict, if necessary.

The Post-Trial Motions are now set for hearing on November 30, 2021. While Parusa believes that its Post-Trial Motions and appeal (if necessary) will ultimately be successful, Parusa, along with FICO, determined that the filing of the Petitions was necessary to address the potential liability of the jury verdict reached in the State Court Case and ensure the orderly process of maximizing its assets values while protecting the interests of all of their constituent creditors and equity interest holders.

Parusa intends to appeal and believes that it has a strong basis to overturn the jury's verdict, including but not limited to the fact that the jury was told the loans from Bestenheider to Parusa were valid and enforceable, without independently assessing the elements of the loans or the amounts allegedly owed, and that the State Court erred in instructing the Jury that the alleged mergers between Parusa, Sixta, Pinewood and Positively Gourmet were all valid, effective and legally binding.[3]

On September 29, 2021, the Court entered an Order Granting Motion for Relief from the Automatic Stay (Doc. No. 62), permitting the parties to advance post-trial motions and an appeal, but not collection efforts.

4.3    The FICO Claims.

(a)    Bestenheider, individually and as assignee of Jacky Bestenheider and Francoise Renggli, also asserts membership interest in FICO of 500 shares (roughly six percent (6%) of the shares of FICO, asserted through an equity proof of interest).  In addition, Xavier Bestenheider, individually and as assignee of and successor in interest to Jacky Bestenheider and Francoise Renggli, filed an unsecured claim in an unknown amount for alleged past due dividends/distributions, as well as unspecified damages for alleged fraud, breach of duty, unjust enrichment, conversion, past due dividends and distributions.

---

[2] Because the State Court determined that there was a merger between Parusa, Sixta, and related named entities Pinewood Investment Corporation and Positively Gourmet, Inc., no ruling was entered as to Sixta.    Parusa and Rothpletz believe the State Court's "merger" ruling was in error.

[3] Seeking entry of a final judgment consistent with the jury verdict entered on June 3, 2021 together with pre-judgment interest, and $500,000 on account of the constructive fraud claim, plus prejudgment interest.

(b)     Bestenheider's claims asserting rights in FICO were filed in both the FICO case (as described above) and the Parusa case as Xavier Bestenheider, on behalf of Sixta Financial, Inc., alleging claims to the extent that the Sixta merger is found to be invalid or ineffective or unwound, and on behalf of himself individually and as the assignee and successor in interest to Sixta's former shareholders, Carine Bestenheider, Jean-Claude Bestenheider, Phillipe Bestenheider, Pierre-Oliver, and Sven Bestenheider, asserting Bestenheider is entitled to an unsecured claim in an unknown amount for alleged damages for failure to provide notice and opportunity to vote to Sixta and its shareholders, failure to pay distributions and dividends, failure to recognize Sixta's alleged ownership rights, denial of appraisal rights, and fraud.

(c)     On October 29, 2021, Xavier Bestenheider, individually and as assignee of and successor in interest to Jacky Bestenheider and Francoise Renggli, filed Adversary Proceeding 21-AP-361 in the Bankruptcy Court, asserting two causes of action against FICO for (1) declaratory relief asserting Bestenheider is owner of 500 shares of FICO, and (2) an equitable accounting under Florida law of FICO's holdings and Bestenheider's rights under FICO.

(d)     Parusa and FICO believe that these alleged claims and asserted interests are without merit, but will reserve for them in the full amount of such Claims and Interests until they are resolved by the State Court.  If necessary, the Debtors will have the Bankruptcy Court estimate any claims for voting purposes or estimate any Class 1 or Class 4 Claim to ensure the appropriate reserves are made to adequately protect such Claimants' interests in full under the Plan.

(e)     The Debtors and Bestenheider plan to mediate their disputes related to the State Court Case and the alleged FICO claims and interests prior to confirmation.

4.4     <u>Sale of Properties</u>.

(a)     The Debtors employed Keen Summit to market and sell the Debtors' real Properties (the Grand Prairie Property, the Tampa Property and the Smyrna Property, but not the Lake Wales Property) through an expansive marketing effort, including the establishment of a data room with due diligence materials.

(b)     The Debtors filed a Motion to Approved Bid Procedures (Doc. No. 65) seeking an order allowing the asset sale process to be completed and one or more of the Properties to be sold free clear of any and all liens, claims and encumbrances, with such liens, claims and encumbrances attaching to any sale proceeds.

(c)     The Bid Procedures were approved on October 13, 2021 (Doc. No. 95, 99 as amended) and the Debtors are moving forward with their marketing efforts and sale process, which includes an auction on December 2, 2021.  While the Debtors have allowed for the inclusion of a stalking horse bidder, no such stalking horse has been identified as of the date of this Disclosure Statement.

(d)     Important deadlines relating to the sale of the Properties is below (which may be subject to changes as subsequently noticed):

| November 12, 2021 | Deadline for Tenant to object to assumption and assignment of its lease or to assert a Cure Amount |
| November 30, 2021, at 4:00 p.m. EST | Deadline to submit a Qualified Bid[4] |
| December 1, 2021, by 9:00 a.m. EST | Advisor will notify each Bidder at the email address set forth on the Offer & Bidder Registration Form if it is a Qualified Bidder |
| December 2, 2021, at 10:00 a.m. EST | Auction of the Properties at Underwood Murray, P.A., 100 N Tampa St. Suite 2325, Tampa, FL 33602, or virtually |
| December 3, 2021 | Deadline to object to the sale of the Properties |
| December 6, 2021, at 9:30 a.m. EST | A final hearing to consider approval of the Sale of the Property |

(e)    The Debtors will reserve sale proceeds in the amount of Bestenheider's Claims in the event the Debtors are not successful in their appeal of the jury verdict in the State Court Case.  See Treatment, Article 5 of the Plan.

4.5    <u>Employment of Professionals</u>.  The Debtors have sought to employ the following Professionals in the Bankruptcy Case:

(a)    <u>Underwood Murray, P.A.</u>  Scott Underwood, and Underwood Murray, P.A., (collectively "**Underwood Murray**") as general bankruptcy counsel for the Debtors. See Doc. No. 4 and 37.

(b)    <u>Keen Summit Capital Partners, LLC.</u>  Harold Bordwin and Keen Summit Capital Partners, LLC (collectively "**Keen Summit**"), as a real estate broker to market and sell certain Properties and facilitate the Auction.  See Doc. Nos. 7 and 49.

(c)    <u>Link & Rockenbach, P.A.</u>  Kara Rockenbach-Link, and Link & Rockenbach, PA, (collectively "**L&R**") as special counsel to prosecute the Appeal of the State Court Case.  See Doc. Nos. 6 and 48.

(d)    <u>Wright, Ponsoldt & Lozeau, Trial Attorneys, LLP.</u>  Tim Wright and the firm of Wright, Ponsoldt & Lozeau, Trial Attorneys, LLP (collectively "**WPL**") as special counsel to the Debtors in the State Court Case.

---

[4] Any capitalized terms not otherwise defined shall have the meaning ascribed to them in the Bid Procedures Order and Bid Procedures, Doc. No. 99.

(e)    Buchanan Ingersoll Rooney PC. Ted Tamargo and the firm of Buchanan Ingersoll Rooney, PC (collectively "**Buchanan**") as special real estate counsel to the Debtors.  See Doc. Nos. 58, 59.

(f)    Kitchens Kelley Gaynes PC. William Berg and Kitchens Kelley Gaynes PC (collectively "**Kitchens**") as special real estate counsel to the Debtors. See Doc. Nos. 82 and 87.

4.6    Assets and Liabilities of the Debtors.

(a)    Assets.

(i)    The Property. The Debtors' primary assets are the real estate Properties listed above, certain of which the Debtors will be marketing for sale and Auction in connection with consummation of the Plan.

(ii)    Leases.  The Debtors' primary source of revenue is the rental revenue obtained from the tenants of the various Properties, which includes rooftop cellular tenants, adding additional stable value to the office and retail rent revenue.

(iii)    Stock.  Parusa owns 100% of FICO.  Xavier Bestenheider, individually and as assignee of or successor in interest to Jacky Bestenheider and Francoise Renggli, claims a small (roughly 6%) interest in FICO and an unsecured claim in an unknown amount for, *inter alia*, alleged fraud, breach of duty, unjust enrichment, conversion, past due dividends and distributions resulting from his ownership interest in FICO, as well as damages resulting therefrom.  The Debtors disagree that this claim of interest and damages has any value.

**ARTICLE V**

**CLASSIFICATION AND TREATMENT OF
CLAIMS AND RELATED ISSUES**

5.1    Classification of Claims.

(a)    Classification.

(i)    General.  Article 3 of the Plan sets forth a designation of Classes of Claims.

(ii)    Unclassified Claims.  In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Claims have not been classified and are excluded from the Classes established in Article 3 of the Plan. The treatment accorded Administrative Claims and Priority Claims is set forth in Article 2 of the Plan.

(b)    Classes.  For the purposes of the Plan, the Claims against the Debtors are grouped in the following Classes in accordance with § 1122(a) of the Bankruptcy Code:

(i)    Class 1 – Unsecured Claims of Bestenheider against FICO.  The filed Unsecured Claims of Bestenheider against FICO.

(ii)    Class 2 –Unsecured Claims against FICO. All General Unsecured Claims against FICO, other than Bestenheider, and not otherwise classified.

(iii)    Class 3 – Equity Interests in FICO. Holders of Equity Interests in FICO.

(iv)    Class 4 –Unsecured Claims of Bestenheider against Parusa.  The Unsecured Claim of Bestenheider following a jury award in favor of Bestenheider against Parusa in the State Court Case.

(v)    Class 5 – Unsecured Claims against Parusa. All General Unsecured Claims against Parusa, other than Bestenheider, and not otherwise classified.

(vi)    Class 6 – Equity Interests in Parusa.  Holders of Equity Interests in Parusa.

5.2    Treatment of Allowed Claims.  The Allowed Claims shall be satisfied in the manner set forth in Article 5 of the Plan.  The treatment of, and the consideration to be received by, holders of Allowed Claims pursuant to the Plan shall be in full satisfaction, settlement, release, extinguishment, and discharge of their respective Allowed Claims.

(a)    Claims.  The following constitutes the treatment under the Plan of the Claims and Interests:

(i)    Class 1 – Unsecured Claims of Bestenheider against FICO.  FICO disputes the Class 1 Claims.  Except to the extent that the Holder of the Allowed Class 1 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Allowed Class 1 Claim, FICO shall reserve such Net Sale Proceeds from the sale of FICO Properties as necessary to adequately protect the interests of the Class 1 Claimant until its Class 1 Claim becomes an Allowed Claim, inclusive of post-confirmation interest.  To the extent that FICO and Class 1 Claimant are unable to agree upon an appropriate reserve, then FICO shall petition the Court to estimate the appropriate reserves to ensure Class 1 Claims are fully reserved for under the Plan as provided herein to fully protect the interests of Class 1.  FICO shall reserve all proceeds from the sale of FICO Properties until such time as Class 1 has been paid in full or has had adequate Cash reserved to fully protect its interests.  Class 1 is Unimpaired and not entitled to vote.

(ii)    Class 2 –Unsecured Claims against FICO. Except to the extent that a Holder of an Allowed Class 2 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for an Allowed Class 2 Claim, all Class 2 Claimants shall have their Allowed Class 2 Claims satisfied in full on the later of (1) the Effective Date, or (2) if the Class 1 Claim has not been fully paid or reserved for (by agreement or Court Order), then following the funding of the full reserve for Class 1 Claims (in the amount agreed upon or Ordered by the Court).  The treatment described above shall be in full satisfaction of the Class 2 Claims.  Class 2 is Impaired and entitled to vote.

19

(iii)    Class 3 – Equity Interests in FICO. Holders of Equity Interests in FICO shall retain their equity interest in the FICO Debtor and receive distributions following the payment or reservation of sufficient funds to satisfy Class 1 and Class 2, less reservation by FICO of sufficient funds for capital operating needs related to any FICO Properties that have not been sold pursuant to the Plan, which distributions or reservation shall be proportionate to the shares of remaining Net Sale Proceeds from the sale of the FICO Properties and FICO's operating Cash on hand at the time.   To the extent of any dispute concerning the rightful holder of FICO's Equity Interests, FICO shall reserve the disputed portion of any such distribution in a reserve account in an amount agreed upon by the disputed interest holder or by Order of Court.   If FICO and any disputed Equity Interest Holder cannot agree upon the proper reserve percentage, then FICO shall petition the Court no later than seven (7) days following Confirmation to estimate such Equity Interest percentage for purposes of this distribution. Class 3 is Unimpaired and not entitled to vote.

(iv)    Class 4 –Claim of Bestenheider against Parusa.  Except to the extent that the Holder of the Allowed Class 4 Claim agrees to a less favorable treatment, Parusa shall utilize both its distribution as a Class 3 Equity Interest Holder and proceeds from the sale of the Grand Prairie Property to reserve for Class 4's full Claim, plus accruing interest, to the full extent Class 4 is entitled as a prospective judgment holder.  Provided that Class 4 does not object, Parusa shall reserve such funds in trust for easy distribution upon a final resolution of Class 4 following appeal of any judgment it obtains.  Alternatively, Parusa shall either post sufficient funds in the registry of the Court or purchase a bond in the full amount to stay Class 4's enforcement of its judgment and ensure full payment of Class 4 if such claim survives on appeal.  In the event of an appellate ruling for Parusa, but that does not fully resolve Class 4 in favor of Parusa, then Parusa shall continue to reserve the same funds pending resolution of Claim 4 upon remand and litigation in State Court, through proper appeals.

The treatment described above shall be in full satisfaction of the Class 4 Claims.  Class 4 is Unimpaired and not entitled to vote.

(v)    Class 5 – Unsecured Claims against Parusa. Except to the extent that a Holder of an Allowed Class 5 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for an Allowed Class 5 Claim, following reservation for Class 4, all Class 5 Claimants shall have their Allowed Class 5 Claims satisfied in full from the proceeds Parusa receives in Class 3 and from proceeds of the sale of the Grand Prairie Property.  The treatment described above shall be in full satisfaction of the Class 5 Claims.  Class 5 is Impaired and entitled to vote.

(vi)    Class 6 – Equity Interests in Parusa.  Holders of Equity Interests in Parusa. Holders of Equity Interests in Parusa shall retain their equity interest in the Parusa Debtor and shall be entitled to distributions following payment or reservation for all other Classes as provided for in this Plan. Class 6 is Unimpaired and not entitled to vote.

5.3    Treatment of Administrative Claims.

(a)    Administrative Claims.  Each holder of an Allowed Administrative Claim, including but not limited to the United States Trustee, shall receive the Allowed Amount of such holder's Allowed Administrative Claim, in Cash, in full satisfaction, settlement, release,

extinguishment and discharge of such Claim, upon the earlier of the Effective Date, or unless otherwise agreed upon by the holder of an Allowed Administrative Claim or as otherwise Allowed by Bankruptcy Court order.  No administrative claimants have filed Administrative Expense Claims as of the date of this Disclosure Statement, but the Debtors anticipate that the Debtors' professionals will file Administrative Expenses Claims before Confirmation.

(b)     Final Fee Applications. Unless otherwise ordered by the Court, all final requests for payment of Professional Claims must be filed no later than sixty (60) days after the Effective Date. After notice and a hearing and in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and prior orders of the Bankruptcy Court, and after such sixty (60) day period has passed, the Allowed amounts of such Professional Claims and expenses shall be determined by the Bankruptcy Court.

(c)     Post-Confirmation Date Retention. Upon the Confirmation Date, any requirement that Professionals comply with Sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors shall employ and pay Professionals in the ordinary course of business (including the reasonable fees and expenses incurred by Professionals in preparing, reviewing, and prosecuting or addressing any issues with respect to final fee applications).

(d)     Priority Claims.  Unless set forth herein or otherwise agreed to by the holder of an Allowed Priority Claim, each holder of an Allowed Priority Claim shall receive the Allowed Amount of such holder's Allowed Priority Claim, in Cash, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, on the Effective Date.  The Debtors are not currently aware of any such Priority claims.  To the extent such Priority Claims exist, the Debtors shall use the funds available in the Debtors' debtor-in-possession account to fund such claims.

5.4     Elimination of Classes. To the extent applicable, any Class that does not contain any Allowed Claims or any Claims temporarily Allowed for voting purposes under Bankruptcy Rule 3018, as of the date of commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under § 1129(a)(8) of the Bankruptcy Code.

5.5     Plan Implementation.

(a)     Sources of Cash for Plan Distributions. All Cash required for payments to be made under the Plan on and after the Effective Date shall be obtained from:

(i)     The Sale of the Properties as needed to pay all Allowed Claims on the Effective Date, or from the Disputed Claims Reserve as such claims become Allowed Claims;

(ii)     Cash on hand at the time of the Effective Date;

(iii)     Net Cash Flow from the Debtors' operations.

(b)     Execution of Plan Documents. Except as otherwise provided in the Plan, on or as soon as reasonably practicable prior to and after the Effective Date, the Reorganized Debtors

shall issue and/or deliver all notes, instruments, certificates, and other documents required to be issued pursuant to the Plan. Except as otherwise provided in the Plan, the Debtors shall continue to exist after the Effective Date as the Reorganized Debtors, with all the powers of a company under applicable law in the jurisdiction in which each respective Debtor is organized and pursuant to its respective articles of organization and bylaws or other organizational documents in effect prior to the Effective Date, except to the extent such certificate of incorporation and bylaws or other organization documents are amended and restated by the Plan, without prejudice to any right to terminate such existence (whether by merger or otherwise) under applicable law after the Effective Date. To the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan without any further notice to or action, order, or approval of the Bankruptcy Court or any other court of competent jurisdiction (other than the requisite filings required under applicable state, provincial, or federal law).  On and after the Effective Date, the Reorganized Debtors, and the officers thereof shall be authorized to and may issue, execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents, and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, or to otherwise comply with applicable law, in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

(c)     <u>Wind Down of Reorganized Debtors</u>.  The Reorganized Debtors shall remain in existence to the extent necessary to consummate this Plan and comply with its terms. Upon the fulfillment of their obligations under this Plan, the management of the Reorganized Debtors shall have the option, in their sole and absolute discretion, to wind down the operations of either of the Reorganized Debtors and, upon completion of the wind down the Reorganized Debtor(s) shall be dissolved without further action on the part of the Reorganized Debtors or their management.

(d)     <u>Reorganized Debtors or their successors on the Effective Date</u>. Pursuant to § 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.

(e)     <u>Directors and Officers of Reorganized Debtors</u>. Pursuant to § 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of the Reorganized Debtors (and, to the extent such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Disclosure Statement, or as announced on the record at the Confirmation Hearing. Roland Rothpletz shall continue in his role as sole owner of RCC Vision, Inc., which shall continue to solely own 100% of Parusa, which shall continue to hold 100% of the stock of FICO, unless the Court determines that Bestenheider holds some portion of FICO's stock. Christophe Rothpletz shall continue as President of both Parusa and FICO unless either or both entity is wound down at the Debtors' discretion. The Debtors anticipate that Christophe Rothpletz will be paid a reasonable salary post-petition to manage the Debtors' affairs, not to exceed the salary he received pre-petition.

(f)  <u>Formation Documents</u>. All formation documents, bylaws, articles of incorporation or otherwise of the Debtors shall be amended in a form as may be required to be consistent with the provisions of the Plan and the Bankruptcy Code. After the Effective Date, the Reorganized Debtor may amend and restate their respective certificates of incorporation, articles of organization and bylaws (or other formation documents relating to limited liability companies) as permitted by the Plan, applicable state law, limited liabilities act and their respective bylaws or other organizational documents.

(g)  <u>Corporate Action</u>. Each of the matters provided for under the Plan involving the corporate structure of the Debtors or the Reorganized Debtors or corporate action to be taken by or required of the Debtors or the Reorganized Debtors shall, as of the Effective Date, be deemed to have occurred and be effective as provided herein, and shall be authorized, approved, and to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by member, creditors, officers or directors of the Debtors or the Reorganized Debtors.

(h)  <u>Preservation of Causes of Action</u>. In accordance with § 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, and such Causes of Action shall vest in the Reorganized Debtors as of the Effective Date. The Reorganized Debtors, in their sole and absolute discretion, shall determine whether to bring, settle, release, compromise, or enforce such Causes of Action (or decline to do any of the foregoing), and shall not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtors or any successor may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successor holding such rights of action. No Entity may rely on the absence of a specific reference in the Plan, Plan Supplement (if applicable) or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), waiver or laches, shall apply to such Causes of Action upon, after, or as a consequence of Confirmation or consummation of the Plan.

(i)  <u>Reservation of Rights</u>. With respect to Avoidance Actions, the Debtors and the Reorganized Debtors, as applicable, reserve all rights, including the right under § 502(d) of the Bankruptcy Code to use defensively Avoidance Actions as a basis to object to all or any part of a claim against the Estate asserted by a creditor which remains in possession of, or otherwise obtains the benefit of, the avoidable transfer.

(j)  <u>Exemption from Certain Transfer Taxes and Recording Fees</u>. Pursuant to Section 1146(a) of the Bankruptcy Code, all transfers of property contemplated herein, even if accomplished after the Effective Date, are being accomplished pursuant to the Plan and shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax,

mortgage tax, stamp act, real estate transfer tax, mortgage recording tax, sales tax, use tax, or other similar tax or governmental assessment to the fullest extent contemplated by § 1146(a) of the Bankruptcy Code, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

5.6     Disputed Claims.

(a)     Objection Deadline.  As soon as practicable, but in no event later than sixty (60) calendar days after the Confirmation Date, unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders thereof and the United States Trustee for the Middle District of Florida.

(b)     Prosecution of Objections.  On and after the Effective Date, only the Reorganized Debtors shall have authority to file objections, litigate to judgment, settle, or withdraw objections to Disputed Claims.  On and after the Effective Date, the Reorganized Debtors shall be entitled to compromise or settle any Disputed Claim without approval of the Bankruptcy Court.  However, the Reorganized Debtors may seek Court approval of they so choose.

(c)     Disputed Claims Reserve. In addition to the specific reserves provided for Classes 1, 3 and 4, as applicable, the Reorganized Debtors shall set aside and reserve for the benefit of each holder of a Disputed Claim an amount equal to the Distributions to which the holder of such Disputed Claim would be entitled if such Disputed Claim were an Allowed Claim, in an amount equal to the amount of such Claim as agreed to between the parties to the Disputed Claim, or as estimated by the Bankruptcy Court pursuant to an order. Such reserved amounts, and the difference between the amount so reserved for each such Claim and the amount of federal, state and local taxes paid by the Debtors with respect to such Claim shall constitute the maximum Distribution amount to which the holder of such Claim may ultimately become entitled to receive.

(d)     Distributions to Holders of Allowed Claims. After the Effective Date, the Reorganized Debtors shall make one or more Distributions to holders of Allowed Claims in accordance with the Plan. Unless otherwise agreed by Class 1 and Class 4 Claimants, all reserves as provided for in Class 1 and Class 4 treatment shall be made prior to the Distributions of any Cash.  The Effective Date shall not occur until all reserves are funded as set forth in Article 11 of the Plan.

(e)     Distributions on Disputed Claims. No Distributions shall be made with respect to a Disputed Claim until the resolution of such dispute by agreement with the Debtors, the Reorganized Debtors, or Final Order. As soon as a Disputed Claim becomes an Allowed Claim, the Debtors shall distribute to the holder thereof Cash, from the Disputed Claims Reserve, in an amount equal to the aggregate amount of Cash that would have been distributed to such holder in respect of such Claim had such Claim been an Allowed Claim, in the amount in which it is ultimately allowed.

(f)    Treatment of Excess Cash in Disputed Claims Reserve. To the extent a Disputed Claim becomes a Disallowed Claim or is reclassified, any Cash previously reserved for such portion of such Disputed Claim shall be treated as Net Cash Flow and distributed in accordance with the Plan. To the extent all payments required under the Plan have already been made, Cash previously reserved for Disputed Claims shall be paid to the Reorganized Debtor, as applicable in accordance with Article 5 of the Plan.

Unclaimed Property.  Any Cash, assets, or other property to be distributed under this Plan that remains unclaimed or otherwise not deliverable to the Person or Governmental Unit entitled thereto as of one hundred and twenty (120) calendar days after the distribution, shall become vested in the Reorganized Debtors to be applied toward the funding of this Plan.  In any such event, such Person's or Governmental Unit's Claim shall no longer be deemed to be Allowed, and such Person or Governmental Unit shall be deemed to have waived its rights to such payments or distributions under this Plan pursuant to § 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distributions.

5.7    Transfer Taxes. The transfer of any assets or property pursuant to this Plan, or the making or delivery of an instrument of transfer under this Plan, shall not (and the Confirmation Order shall so order), pursuant to § 1146 of the Bankruptcy Code, be taxed under any law imposing a stamp, transfer tax or other similar tax.

5.8    Effectuating Documents and Further Transactions.  The Debtors and their current management shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents, to the extent necessary, and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

5.9    Effects of Plan Confirmation.

(a)    Injunction.

Pursuant to §§ 105, 524, 1123, 1129 and 1141 of the Bankruptcy Code, to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Confirmation Date, except as otherwise provided in the Plan or in the Confirmation Order, all persons or entities that have held, currently hold or may hold a Claim or other debt or liability, that is dischargeable pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged Claims, debtor or liabilities, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents: (a) commencing or continuing in any manner any action or other proceeding against the Debtors, the Reorganized Debtors, or their respective property; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or their assets; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtors, the Reorganized Debtors, or their assets; (d) asserting a setoff, right of subrogation, or recoupment of any against any debt, liability, or obligation due to the Debtors or Reorganized Debtors; or (e) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent

with the provisions of the Plan or the Confirmation Order.  The Debtors and Reorganized Debtors shall have the right to independently seek enforcement of this general injunction provision.  This general injunction provision is an integral part of the Plan and is essential to its implementation.

All injunctions or automatic stays provided for in the reorganization case pursuant to §§ 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the property is no longer property of the estate.  Any preliminary or permanent injunction entered by the Bankruptcy Court such as the Confirmation Order, shall continue in full force and effect following the Confirmation Date and final decree date, unless otherwise ordered by the Bankruptcy Court.

Notwithstanding the foregoing, the general injunction shall not apply to (a) the ongoing State Court Case, which the Bankruptcy Court has authorized to proceed to judgment and conclusion of an appeal, but not collection, pursuant to Doc. No. 75, or (b) any rights Bestenheider has to proceed against assets of the Debtors pursuant to his treatment under Article 5 of the Plan following the time upon which his Class 4 Claim becomes an Allowed Claim.

**(b)    DEBTORS' RELEASE.    THE DEBTORS' PROFESSIONALS (ACTING IN SUCH CAPACITY), SHALL NEITHER HAVE NOR INCUR ANY LIABILITY WHATSOEVER TO ANY PERSON OR ENTITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN IN GOOD FAITH IN CONNECTION WITH OR RELATED TO THE FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, THE DISCLOSURE STATEMENT, ANY PLAN DOCUMENT, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO, OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN, IN CONNECTION WITH THE PLAN OR THE BANKRUPTCY CASE; PROVIDED, HOWEVER, THAT THIS EXCULPATION FROM LIABILITY PROVISION SHALL NOT BE APPLICABLE TO ANY LIABILITY FOUND BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM GROSS MISMANAGEMENT, BREACH OF FIDUCIARY DUTY, FRAUD OR THE WILLFUL MISCONDUCT OF ANY SUCH PARTY.  THE RIGHTS GRANTED HEREIN ARE CUMULATIVE WITH (AND NOT RESTRICTIVE OF) ANY AND ALL RIGHTS REMEDIES, AND BENEFITS THAT THE DEBTORS OR THEIR PROFESSIONALS HAVE OR OBTAIN PURSUANT TO ANY PROVISION OF THE BANKRUPTCY CODE OR OTHER APPLICABLE LAW.  THIS EXCULPATION FROM LIABILITY PROVISION IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO ITS IMPLEMENTATION.  NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE PROVISIONS OF THIS ARTICLE SHALL NOT RELEASE OR BE DEEMED A RELEASE OF ANY OF THE CAUSES OF ACTION**

**(c)    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION ORDER OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL PERSONS OR ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST THE DEBTORS ARE TEMPORARILY ENJOINED FROM PROCEEDING AGAINST ROLAND ROTHPLETZ OF ANY OBLIGATION OF THE DEBTORS, THEIR SUCCESSORS, OR THEIR PROPERTY, FOR THE**

**COLLECTION OF ALL OR ANY PORTION OF THEIR ALLOWED CLAIM, SAID INJUNCTION TO REMAIN IN EFFECT ONLY FOR SO LONG AS THE REORGANIZED DEBTORS COMPLY WITH THE TERMS OF THE PLAN. ANY VIOLATION OF THE PLAN THAT REMAINS UNCURED FOR THIRTY (30) DAYS AFTER RECEIPT BY THE REORGANIZED DEBTORS OF WRITTEN NOTICE FROM ANY PARTY AFFECTED BY SUCH VIOLATION SHALL AUTOMATICALLY AND WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT RESULT IN THE DISSOLUTION OF THE INJUNCTION GRANTED HEREUNDER AS TO SAID AFFECTED PARTY.**

(d)     <u>Term of Injunction and the Automatic Stay</u>.  Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, the injunction described above of the Plan shall remain in full force and effect following the Effective Date.  All other injunctions or automatic stays provided for in the Bankruptcy Case pursuant to § 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

(e)     <u>Disallowed Claims</u>.  On and after the Effective Date, the Estate shall be fully and finally discharged of any liability or obligation on a Disallowed Claim.

(f)     <u>Retention and Enforcement of Causes of Action</u>.  Pursuant to § 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and have the exclusive right to enforce any and all Causes of Action and rights of the Debtors that arose both before and after the Petition Date.

<u>Effective Date Transactions</u>.  On the date following the Effective Date, the Reorganized Debtors shall be automatically substituted for the Debtors as a party to all contested matters, adversary proceedings, Claims, administrative proceedings, and lawsuits, both within and outside of the Bankruptcy Court, involving all assets, Claims against the Debtors, Causes of Action, and the resolution of any Disputed Claims, without the need to file any paper to accomplish same.  All of the assets of the Estate shall vest in the Reorganized Debtors, and all privileges with respect to all assets of the Estate, including the attorney/client privilege, to which the Debtors are or would be entitled, shall automatically vest in, and may be asserted by or waived on behalf of, the Reorganized Debtors.  Holders of liens in the Reorganized Debtors shall retain such liens to the same extent and priority as they were held in the Debtors.

(g)     <u>Discharge</u>.  Pursuant to § 1141(d), confirmation of the Plan and successful completion of payments thereunder shall grant the Debtors a discharge, to the fullest extent possible, of any and all debts and Claims of any nature whatsoever that arose at any time prior to the Effective Date.

5.10    <u>Assumption of Executory Contracts and Unexpired Leases</u>.

(a)     The Debtors are parties to unexpired Executory Contracts, including but not limited to non-residential real property leases and telecommunication leases. In connection with the sale of the Properties, the Debtors and any purchaser may elect certain Executory Contracts and Unexpired Leases they intend to assume and assign to the respective purchaser of the Property.

The Debtors anticipate that all Unexpired Leases will be assumed.  Should any particular Property not be sold within sixty (60) days of the Effective Date of this Plan (or such later time as the Court subsequently orders), then the Debtors shall file notices of intent to assume or reject Executory Contracts and Unexpired Leases. The times for counterparties to Executory Contracts and Unexpired Leases to assert a Cure Amount shall be those set forth in the Bid Procedures and Bid Procedures Order.  If the Executory Contract or Unexpired Lease is not addressed through the sale process then the deadlines provided in this paragraph shall apply.

(b)    Cure of Defaults for Assumed, or Assumed and Assigned, Unexpired Leases. The deadline for any current tenant of the Debtors (under a real property or telecommunications lease) to object to the assumption and assignment of its lease or to assert a Cure Amount (as defined below) is November 12, 2021. A "Cure Amount" is the amount that any tenant (or Executory Contract holder) believes is necessary to assume its lease pursuant to § 365 of the Bankruptcy Code. Any such objection related to the assumption and assignment of a lease or to a Cure Amount must state with specificity what Cure Amount the tenant believes is required with appropriate documentation in support thereof. If no objection is timely received, the Debtors shall be entitled to assume and assign all leases without further notice, and all tenants shall be forever barred, estopped and enjoined from asserting or claiming that any additional amounts are due or a defaults exist, or that there is any objection or defense to the assumption and assignment of such lease, including any argument that there exist conditions to assumption and assignment that must be satisfied under such lease or that any required consent to assignment has not been given.

(c)    Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned, shall be satisfied, pursuant to § 365(b)(1) of the Bankruptcy Code, by payment of a Cure Amount in Cash at closing of the sale of a Property (or upon allowance if the Cure Amount is disputed), subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.

(d)    In the event of a dispute regarding: (1) the amount of any Cure Amount; (2) the ability of the Reorganized Debtors, any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of § 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (3) any other matter pertaining to assumption or the assumption and assignment, the Cure Amount shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment. Notwithstanding the foregoing, nothing herein shall prevent the Reorganized Debtors from settling any Cure Amount without further notice to or action, order, or approval of the Bankruptcy Court.

(e)    Damages Upon Rejection. The Bankruptcy Court shall determine the dollar amount, if any, of the Claim of any Person or Governmental Unit seeking damages by reason of the rejection of any Executory Contract or Unexpired Lease; provided, however, that such Person or Governmental Unit files a Proof of Claim with the Bankruptcy Court before thirty (30) calendar days following the Confirmation Date or such other deadline established by the Bankruptcy Court. To the extent any such Claim is allowed by the Bankruptcy Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as, an Allowed Unsecured Claim and

the holder thereof shall receive distributions as a holder of an Allowed Claim in such Class as applicable pursuant to the Plan.

## ARTICLE VI

## ALTERNATIVES TO THE PLAN

6.1     Best Interests of Holders of Claims.

In order to confirm a chapter 11 Plan, the Bankruptcy Court must independently determine that the Plan is in the best interests of all Classes Impaired by the Plan.  The "best interests" test requires that the Bankruptcy Court find either that all members of an Impaired Class of Claims or Interests have accepted the Plan, or that the Plan will provide such member a recovery that has a value at least equal to the value of the distribution that each such member would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.

To calculate what members of each Impaired Class would receive if the Debtors were liquidated, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtors' assets if the chapter 11 case were converted to a chapter 7 case under the Bankruptcy Code.  This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtor's assets by a chapter 7 trustee.

The Debtors believe that a chapter 7 liquidation would result in recoveries less than the recoveries expected to be received pursuant to the Plan because the Plan provides for a value maximizing liquidation of the Properties.

6.2     Other Alternatives to the Plan.  If the Plan is not confirmed, the Debtors or any other party in interest could attempt to formulate a different chapter 11 Plan or convert the Bankruptcy Case to a chapter 7, which would not be economically prudent. Alternatively, the Bankruptcy Case may be dismissed and additional costs could be incurred which are otherwise not necessary to resolve all creditors' claims through this Plan.

6.3     Liquidation Analysis.  If the Plan is not confirmed, it is likely that the Estate would be liquidated with an additional layer of fees and costs, further delaying recovery and impairing creditors' recoveries.   This Plan proposes to sell the Debtors' Property in a timely and efficient manner and pay or reserve for payment of all claims in full, while prosecuting an appeal of the State Court Case to determine liability expeditiously.  The Debtors believe the value of the Properties exceeds all claims in this case.  In this scenario, no separate liquidation analysis is needed, as holders of Allowed Claims will receive at least as much as they would receive in a liquidation.

6.4     Risk Factors.  The Debtors' primary source of funding for the Plan will be the Net Sale Proceeds and Cash from business operations.   If the Net Sale Proceeds are less than anticipated, there is a risk that recoveries will be lower than anticipated.

**ARTICLE VII**

**EFFECTUATION AND SUPERVISION OF THE PLAN**

7.1    Jurisdiction.  Until the Bankruptcy Case is closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out and to hear and determine all Claims that could have been brought before the entry of the Confirmation Order.  Except as otherwise provided in the Plan, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtors and all Causes of Action brought by the Debtors.

7.2    General Retention.  Following Confirmation of the Plan, the Bankruptcy Court shall also retain jurisdiction for the purposes of classifying any Claim, or re-examining Claims that have been Allowed for purposes of determining such objections as may be filed with the Bankruptcy Court with respect to any Claim.

7.3    Specific Purposes.  In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction for the following specific purposes after the Confirmation of the Plan:

    (a)    to approve sales of Properties pursuant to this Plan;

    (b)    to modify the Plan after Confirmation, pursuant to the Bankruptcy Rules and the Bankruptcy Code;

    (c)    to correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the dates of performance under the Plan and any other documents related thereto in the event the Effective Date does not occur as provided herein, so that the intended effect of the Plan and such other documents may be substantially realized thereby;

    (d)    to assure the performance by the Debtors of their obligations under the Plan;

    (e)    to enforce and interpret the terms and conditions of the Plan;

    (f)    to hear and determine all applications for compensation of professionals and reimbursement of expenses under §§ 330, 331 or 503(b) of the Bankruptcy Code;

    (g)    to hear and determine any Causes of Action over which the Bankruptcy Court has jurisdiction arising during the period from the Petition Date through the Effective Date, or in any way related to the Plan or the transactions contemplated hereby;

    (h)    to determine any and all motions pending on Confirmation for the rejection, assumption or assignment of Executory Contracts or unexpired leases and the allowance of any Claim resulting therefrom;

    (i)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(j)     to consider and act on the compromise and settlement of any Claim against the Debtors or their Estates;

(k)     to determine all questions and disputes regarding title to the assets of the Debtors or their Estates;

(l)     to enter such Orders as are necessary to implement and enforce the injunctions described herein;

(m)     to enter such Orders as are necessary to implement and enforce any other Orders entered in the Bankruptcy Case; and

(n)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code.

## ARTICLE VIII

## <u>CONDITIONS PRECEDENT TO EFFECTIVENESS</u>

8.1     <u>Conditions to Confirmation.</u> Notwithstanding any other provision of the Plan or Confirmation Order, the Effective Date of the Plan shall not occur until the following conditions are met.

(a)     The Confirmation Order has become a Final Order; and

(b)     The reserves provided for in Class 1 and Class 4 are fully funded in amounts sufficient to ensure the Class 1 and Class 4 Claimants are not Impaired.

Respectfully submitted,

Dated: November 8, 2021

Parusa Investment Corporation

By: *Christophe Rothpletz*
    Christophe Rothpletz, President

FICO Financial Corporation

By: *Christophe Rothpletz*
    Christophe Rothpletz, President

/s/Scott A. Underwood
Scott A. Underwood
Florida Bar Number 0730041
Megan W. Murray
Florida Bar Number 0093922
Adam M. Gilbert
Florida Bar Number 1011637
UNDERWOOD MURRAY, P.A.
100 N Tampa St., Suite 2325
Tampa, FL 33602
Tel: (813) 540-8401 / Fax: (813) 553-5345
Email: sunderwood@underwoodmurray.com
      mmurray@underwoodmurray.com
      agilbert@underwoodmurray.com
*Counsel to the Debtors*

EXHIBIT A

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**
**www.flmb.uscourts.gov**

In re                                                    Chapter 11

PARUSA INVESTMENT CORPORATION            Case No. 8:21-bk-03854-MGW

                                                        *Jointly Administered*

FICO FINANCIAL CORPORATION                  Case No. 8:21-bk-03853-MGW

        Debtors.
_____/

**PARUSA INVESTMENT CORPORATION AND FICO**
**FINANCIAL CORPORATION'S JOINT PLAN OF REORGANIZATION**

November 8, 2021

                        /s/ __Scott A. Underwood_____
                        Scott A. Underwood
                        Florida Bar Number 0730041
                        Megan W. Murray
                        Florida Bar Number 0093922
                        Adam M. Gilbert
                        Florida Bar Number 1011637
                        UNDERWOOD MURRAY, P.A.
                        100 N Tampa St. Suite 2325
                        Tampa, FL 33602
                        Tel: (813) 540-8401 / Fax: (813) 553-5345
                        Email: sunderwood@underwoodmurray.com
                                mmurray@underwoodmurray.com
                                agilbert@underwoodmurray.com
                        *Counsel to the Debtors*

## ARTICLE 1

Unless the context otherwise requires, the Definitions set forth in the Debtors' Joint Disclosure Statement in support of their Joint Plan of Reorganization shall have the meanings when used in initially capitalized form in this Plan or the Disclosure Statement. Such meanings shall be equally applicable to both the singular and plural forms of such terms. Any term used in capitalized form that is not defined in the Plan or Disclosure Statement but that is defined in the Bankruptcy Code or Bankruptcy Rules shall have the meaning ascribed to such term in the Bankruptcy Code or Bankruptcy Rules. The rules of construction set forth in § 102 of the Bankruptcy Code shall apply in construction of the Plan.

## ARTICLE 2

2.1    Administrative Claims.    Each holder of an Allowed Administrative Claim, including but not limited to the United States Trustee, shall receive the Allowed Amount of such holder's Allowed Administrative Claim, in Cash, in full satisfaction, settlement, release, extinguishment and discharge of such Claim, upon the earlier of the Effective Date, or unless otherwise agreed upon by the holder of an Allowed Administrative Claim or as otherwise Allowed by Bankruptcy Court order.

The Debtors shall pay the United States Trustee the appropriate fees required pursuant to 28 U.S.C. § 1930(a)(6) based upon all disbursements by the Debtors for pre-confirmation periods and by the Reorganized Debtors for post-confirmation periods within the time period set forth in 28 U.S.C. § 1930(a)(6), and shall continue to file post confirmation quarterly reports, until the earlier of the closing of the case by the issuance of a final decree by the Court, or upon entry of an order by this Court dismissing the case or converting it to another Chapter under the Bankruptcy Code.

2.2    Priority Claims.    The Debtors are not aware of any Priority Claims.

## ARTICLE 3

## CLASSIFICATION OF CLAIMS AND INTERESTS

3.1    Classification.

(a)    General. Section 3.2 herein sets forth a designation of Classes of Claims.

(b)    Unclassified Claims.    In accordance with § 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Claims have not been classified and are excluded from the Classes established in Section 3.2 herein.  The treatment accorded Administrative Claims is set forth in Article 2 of this Plan.

3.2    Classes.  For the purposes of the Plan, the Claims against the Debtors are grouped in the following Classes in accordance with § 1122(a) of the Bankruptcy Code:

(i)    Class 1 – Unsecured Claims of Bestenheider against FICO.  The filed Unsecured Claims of Bestenheider against FICO.

2

(ii)    <u>Class 2 –Unsecured Claims against FICO</u>. All General Unsecured Claims against FICO, other than Bestenheider, and not otherwise classified.

(iii)    <u>Class 3 – Equity Interests in FICO</u>. Holders of Equity Interests in FICO.

(iv)    <u>Class 4 –Unsecured Claims of Bestenheider against Parusa</u>.   The Unsecured Claim of Bestenheider following a jury award in favor of Bestenheider against Parusa in the State Court Case.

(v)    <u>Class 5 – Unsecured Claims against Parusa</u>. All General Unsecured Claims against Parusa, other than Bestenheider, and not otherwise classified.

(vi)    <u>Class 6 – Equity Interests in Parusa</u>.  Holders of Equity Interests in Parusa.

## ARTICLE 4

## IMPAIRMENT

4.1    <u>Classes of Claims Impaired by the Plan</u>.   Classes 2 and 5 are Impaired by the Plan.

## ARTICLE 5

## TREATMENT OF CLAIMS AND INTERESTS

5.1    <u>Claims</u>. The following constitutes the treatment of the Claims under this Plan.

(i)    <u>Class 1 – Unsecured Claims of Bestenheider against FICO</u>.  FICO disputes the Class 1 Claims.  Except to the extent that the Holder of the Allowed Class 1 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for the Allowed Class 1 Claim, FICO shall reserve such Net Sale Proceeds from the sale of FICO Properties as necessary to adequately protect the interests of the Class 1 Claimant until its Class 1 Claim becomes an Allowed Claim, inclusive of post-confirmation interest.  To the extent that FICO and Class 1 Claimant are unable to agree upon an appropriate reserve, then FICO shall petition the Court to estimate the appropriate reserves to ensure Class 1 Claims are fully reserved for under the Plan as provided herein to fully protect the interests of Class 1.   FICO shall reserve all proceeds from the sale of FICO Properties until such time as Class 1 has been paid in full or has had adequate Cash reserved to fully protect its interests.  Class 1 is Unimpaired and not entitled to vote.

(ii)    <u>Class 2 –Unsecured Claims against FICO</u>. Except to the extent that a Holder of an Allowed Class 2 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for an Allowed Class 2 Claim, all Class 2 Claimants shall have their Allowed Class 2 Claims satisfied in full on the later of (1) the Effective Date, or (2) if the Class 1 Claim has not been fully paid or reserved for (by agreement or Court Order), then following the funding of the full reserve for Class 1 Claims (in

3

the amount agreed upon or Ordered by the Court).  The treatment described above shall be in full satisfaction of the Class 2 Claims.  Class 2 is Impaired and entitled to vote.

(iii)    Class 3 – Equity Interests in FICO.  Holders of Equity Interests in FICO shall retain their equity interest in the FICO Debtor and receive distributions following the payment or reservation of sufficient funds to satisfy Class 1 and Class 2, less reservation by FICO of sufficient funds for capital operating needs related to any FICO Properties that have not been sold pursuant to the Plan, which distributions or reservation shall be proportionate to the shares of remaining Net Sale Proceeds from the sale of the FICO Properties and FICO's operating Cash on hand at the time.  To the extent of any dispute concerning the rightful holder of FICO's Equity Interests, FICO shall reserve the disputed portion of any such distribution in a reserve account in an amount agreed upon by the disputed interest holder or by Order of Court.  If FICO and any disputed Equity Interest Holder cannot agree upon the proper reserve percentage, then FICO shall petition the Court no later than seven (7) days following Confirmation to estimate such Equity Interest percentage for purposes of this distribution.  Class 3 is Unimpaired and not entitled to vote.

(i)    Class 4 –Claim of Bestenheider against Parusa.    Except to the extent that the Holder of the Allowed Class 4 Claim agrees to a less favorable treatment, Parusa shall utilize both its distribution as a Class 3 Equity Interest Holder and proceeds from the sale of the Grand Prairie Property to reserve for Class 4's full Claim, plus accruing interest, to the full extent Class 4 is entitled as a prospective judgment holder.  Provided that Class 4 does not object, Parusa shall reserve such funds in trust for easy distribution upon a final resolution of Class 4 following appeal of any judgment it obtains.  Alternatively, Parusa shall either post sufficient funds in the registry of the Court or purchase a bond in the full amount to stay Class 4's enforcement of its judgment and ensure full payment of Class 4 if such claim survives on appeal.  In the event of an appellate ruling for Parusa, but that does not fully resolve Class 4 in favor of Parusa, then Parusa shall continue to reserve the same funds pending resolution of Claim 4 upon remand and litigation in State Court, through proper appeals.

The treatment described above shall be in full satisfaction of the Class 4 Claims.  Class 4 is Unimpaired and not entitled to vote.

(ii)    Class 5 – Unsecured Claims against Parusa.  Except to the extent that a Holder of an Allowed Class 5 Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for an Allowed Class 5 Claim, following reservation for Class 4, all Class 5 Claimants shall have their Allowed Class 5 Claims satisfied in full from the proceeds Parusa receives in Class 3 and from proceeds of the sale of the Grand Prairie Property.  The treatment described above shall be in full satisfaction of the Class 5 Claims.  Class 5 is Impaired and entitled to vote.

(iii)    Class 6 – Equity Interests in Parusa.  Holders of Equity Interests in Parusa. Holders of Equity Interests in Parusa shall retain their equity interest in the Parusa Debtor and shall be entitled to distributions following payment or reservation for all other Classes as provided for in this Plan. Class 6 is Unimpaired and not entitled to vote.

## ARTICLE 6

## MEANS FOR EXECUTION OF PLAN

6.1 <u>Plan Implementation</u>.

(b)     The Debtors will market and sell some or all of the Debtors' Properties located in Florida, Texas and Georgia in amounts necessary to fulfill all elements of the Plan. The Debtors intend to sell the Properties through a structured sale process, with a goal of <u>initial</u> closing or closings to occur no later than December 31, 2021.  The Net Sale Proceeds from the sale of the Debtors' Properties will be used to fund the Debtors' Plan and pay or reserve for all Allowed Claims, following payment of all administrative claims, including but not limited to all IRS tax liability, whether pass through to parent entities (indirect) or direct, and accruing post-petition in any form, including but not limited to income, appreciation, or capital gains liabilities.

(c)     Proceeds from the sale of the Properties will pay or reserve for all Allowed Claims on the Effective Date, as set forth below. Principally, the Debtors intend to reserve funds necessary to pay Parusa's largest disputed creditor, Xavier Bestenheider, who currently asserts a disputed, unsecured jury verdict award in the approximate amount of $5,565,786.80, plus prejudgment interest and fees.  The Debtors intend to appeal this award but reserve all amounts necessary to pay this claim in full, if necessary, following a final Court Order at the resolution of the State Court Case.

(d)     The Debtors believe that the collective value of the Properties is far more than sufficient to pay all Allowed Claims in full, even if the Debtors are ultimately required to pay the award listed in section (b) above.

(e)     Creditors will be paid according to the priority scheme established by the Bankruptcy Code.

6.2     <u>Management of the Reorganized Debtors</u>.  Immediately upon the occurrence of the Effective Date, Christophe Rothpletz shall be the President of the Reorganized Debtors, with full and complete authority to manage and direct the operation of the Reorganized Debtor.

(a)     <u>Reorganized Debtors or their successors on the Effective Date</u>. Pursuant to § 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute good-faith compromise and settlement of all Claims and Interests and controversies relating to the contractual, legal, and subordination rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Interest or any distribution to be made on account of such Allowed Claim or Interest.

(b)     <u>Directors and Officers of Reorganized Debtors</u>. Pursuant to § 1129(a)(5) of the Bankruptcy Code, the identity and affiliations of the Reorganized Debtors (and, to the extent such Person is an insider, the nature of any compensation for such Person) shall be disclosed in the Disclosure Statement, or as announced on the record at the Confirmation Hearing. Roland Rothpletz shall continue in his role as sole owner of RCC Vision, Inc., which shall continue to solely own 100% of Parusa, which shall continue to hold 100% of the stock of

FICO, unless the Court determines that Bestenheider holds some portion of FICO's stock. Christophe Rothpletz shall continue as President of both Parusa and FICO unless either or both entity is wound down at the Debtors' discretion. The Debtors anticipate that Christophe Rothpletz will be paid a reasonable salary post-petition to manage the Debtors' affairs, not to exceed the salary he received pre-petition.

6.3    <u>Provisions Concerning Plan Distributions</u>.

(a)    <u>Disbursing Agent</u>.  The Reorganized Debtors shall act as the disbursing agent and shall make all distributions required under this Plan.

(b)    <u>Date of Distributions</u>.  Distributions shall be made from the Debtors' debtor-in-possession accounts on the occurrence of the Effective Date, or as otherwise set forth in the Plan.

6.4    <u>Disputed Claims</u>.

(a)    <u>Objection Deadline</u>.  As soon as practicable, but in no event later than sixty (60) calendar days after the Confirmation Date, unless otherwise ordered by the Bankruptcy Court, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders thereof and the United States Trustee for the Middle District of Florida.

(b)    <u>Prosecution of Objections</u>.  On and after the Effective Date, only the Reorganized Debtors shall have authority to file objections, litigate to judgment, settle, or withdraw objections to Disputed Claims.  On and after the Effective Date, the Reorganized Debtors shall be entitled to compromise or settle any Disputed Claim without approval of the Bankruptcy Court.  However, the Reorganized Debtors may seek Court approval of they so choose.

(c)    <u>Disputed Claims Reserve</u>. In addition to the specific reserves provided for Classes 1, 3, and 4, as applicable, the Reorganized Debtors shall set aside and reserve for the benefit of each holder of a Disputed Claim an amount equal to the Distributions to which the holder of such Disputed Claim would be entitled if such Disputed Claim were an Allowed Claim, in an amount equal to the amount of such Claim as agreed to between the parties to the Disputed Claim, or as estimated by the Bankruptcy Court pursuant to an order. Such reserved amounts, and the difference between the amount so reserved for each such Claim and the amount of federal, state and local taxes paid by the Debtors with respect to such Claim shall constitute the maximum Distribution amount to which the holder of such Claim may ultimately become entitled to receive.

(d)    <u>Distributions to Holders of Allowed Claims</u>. After the Effective Date, the Reorganized Debtors shall make one or more Distributions to holders of Allowed Claims in accordance with the Plan. Unless otherwise agreed by Class 1 and Class 4 Claimants, all reserves as provided for in Class 1 and Class 4 treatment shall be made prior to the Distributions of any Cash.  The Effective Date shall not occur until all reserves are funded as set forth in Article 11 of the Plan.

6

(e)     <u>Distributions on Disputed Claims</u>. No Distributions shall be made with respect to a Disputed Claim until the resolution of such dispute by agreement with the Debtors, the Reorganized Debtors, or Final Order. As soon as a Disputed Claim becomes an Allowed Claim, the Debtors shall distribute to the holder thereof Cash, from the Disputed Claims Reserve, in an amount equal to the aggregate amount of Cash that would have been distributed to such holder in respect of such Claim had such Claim been an Allowed Claim, in the amount in which it is ultimately allowed.

(f)     <u>Treatment of Excess Cash in Disputed Claims Reserve</u>. To the extent a Disputed Claim becomes a Disallowed Claim or is reclassified, any Cash previously reserved for such portion of such Disputed Claim shall be treated as Net Cash Flow and distributed in accordance with the Plan. To the extent all payments required under the Plan have already been made, Cash previously reserved for Disputed Claims shall be paid to the Reorganized Debtor, as applicable in accordance with Article 5 of the Plan.

6.5     <u>Unclaimed Property</u>.  Any Cash, assets, or other property to be distributed under this Plan that remains unclaimed or otherwise not deliverable to the Person or Governmental Unit entitled thereto as of one hundred and twenty (120) calendar days after the distribution, shall become vested in the Reorganized Debtors to be applied toward the funding of this Plan.  In any such event, such Person's or Governmental Unit's Claim shall no longer be deemed to be Allowed, and such Person or Governmental Unit shall be deemed to have waived its rights to such payments or distributions under this Plan pursuant to § 1143 of the Bankruptcy Code and shall have no further Claim in respect of such distributions.

6.6     <u>Transfer Taxes</u>. The transfer of any assets or property pursuant to this Plan, or the making or delivery of an instrument of transfer under this Plan, shall not (and the Confirmation Order shall so order), pursuant to § 1146 of the Bankruptcy Code, be taxed under any law imposing a stamp, transfer tax or other similar tax.

6.7     <u>Effectuating Documents and Further Transactions</u>.  The Debtors and their current management shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, indentures and other agreements or documents, to the extent necessary, and take or direct such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

## ARTICLE 7

## EFFECTS OF PLAN CONFIRMATION

7.1     <u>Injunction</u>.  Pursuant to §§ 105, 524, 1123, 1129 and 1141 of the Bankruptcy Code, to preserve and implement the various transactions contemplated by and provided for in the Plan, as of the Confirmation Date, except as otherwise provided in the Plan or in the Confirmation Order, all persons or entities that have held, currently hold or may hold a Claim or other debt or liability, that is dischargeable pursuant to the terms of the Plan are and shall be permanently enjoined and forever barred to the fullest extent permitted by law from taking any of the following actions on account of any such discharged Claims, debts or liabilities, other than actions brought to enforce any rights or obligations under the Plan or the Plan Documents: (a)

commencing or continuing in any manner any action or other proceeding against the Debtors, the Reorganized Debtors, or their respective property; (b) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Debtors, the Reorganized Debtors, or their assets; (c) creating, perfecting or enforcing any lien or encumbrance against the Debtors, the Reorganized Debtors, or their assets; (d) asserting a setoff, right of subrogation, or recoupment of any against any debt, liability, or obligation due to the Debtors or Reorganized Debtors; or (e) commencing or continuing in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.   The Debtors and Reorganized Debtors shall have the right to independently seek enforcement of this general injunction provision.   This general injunction provision is an integral part of the Plan and is essential to its implementation.

All injunctions or automatic stays provided for in the reorganization case pursuant to §§ 105, 362 or other applicable provisions of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the property is no longer property of the estate.   Any preliminary or permanent injunction entered by the Bankruptcy Court such as the Confirmation Order, shall continue in full force and effect following the Confirmation Date and final decree date, unless otherwise ordered by the Bankruptcy Court.

Notwithstanding the foregoing, the general injunction shall not apply to (a) the ongoing State Court Case, which the Bankruptcy Court has authorized to proceed to judgment and conclusion of an appeal, but not collection, pursuant to Doc. No. 75, or (b) any rights Bestenheider has to proceed against assets of the Debtors pursuant to his treatment under Article V following the time upon which his Class 4 Claim becomes an Allowed Claim.

**THE DEBTORS' PROFESSIONALS (ACTING IN SUCH CAPACITY), SHALL NEITHER HAVE NOR INCUR ANY LIABILITY WHATSOEVER TO ANY PERSON OR ENTITY FOR ANY ACT TAKEN OR OMITTED TO BE TAKEN IN GOOD FAITH IN CONNECTION WITH OR RELATED TO THE FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, THE DISCLOSURE STATEMENT, ANY PLAN DOCUMENT, OR ANY CONTRACT, INSTRUMENT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO, OR ANY OTHER ACT TAKEN OR OMITTED TO BE TAKEN, IN CONNECTION WITH THE PLAN OR THE BANKRUPTCY CASE; PROVIDED, HOWEVER, THAT THIS EXCULPATION FROM LIABILITY PROVISION SHALL NOT BE APPLICABLE TO ANY LIABILITY FOUND BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM GROSS MISMANAGEMENT, BREACH OF FIDUCIARY DUTY, FRAUD OR THE WILLFUL MISCONDUCT OF ANY SUCH PARTY.   THE RIGHTS GRANTED HEREIN ARE CUMULATIVE WITH (AND NOT RESTRICTIVE OF) ANY AND ALL RIGHTS REMEDIES, AND BENEFITS THAT THE DEBTORS OR THEIR PROFESSIONALS HAVE OR OBTAIN PURSUANT TO ANY PROVISION OF THE BANKRUPTCY CODE OR OTHER APPLICABLE LAW.   THIS EXCULPATION FROM LIABILITY PROVISION IS AN INTEGRAL PART OF THE PLAN AND IS ESSENTIAL TO ITS IMPLEMENTATION.   NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN, THE PROVISIONS OF THIS ARTICLE SHALL NOT RELEASE OR BE DEEMED A RELEASE OF ANY OF THE CAUSES OF ACTION.**

**EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE CONFIRMATION ORDER OR A SEPARATE ORDER OF THE BANKRUPTCY COURT, ALL PERSONS OR ENTITIES WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS AGAINST THE DEBTORS ARE TEMPORARILY ENJOINED FROM PROCEEDING AGAINST ROLAND ROTHPLETZ OF ANY OBLIGATION OF THE DEBTORS, THEIR SUCCESSORS, OR THEIR PROPERTY, FOR THE COLLECTION OF ALL OR ANY PORTION OF THEIR ALLOWED CLAIM, SAID INJUNCTION TO REMAIN IN EFFECT ONLY FOR SO LONG AS THE REORGANIZED DEBTORS COMPLY WITH THE TERMS OF THE PLAN. ANY VIOLATION OF THE PLAN THAT REMAINS UNCURED FOR THIRTY (30) DAYS AFTER RECEIPT BY THE REORGANIZED DEBTORS OF WRITTEN NOTICE FROM ANY PARTY AFFECTED BY SUCH VIOLATION SHALL AUTOMATICALLY AND WITHOUT FURTHER ORDER OF THE BANKRUPTCY COURT RESULT IN THE DISSOLUTION OF THE INJUNCTION GRANTED HEREUNDER AS TO SAID AFFECTED PARTY.**

(c)      Terms of Injunction and Automatic Stay.  Unless otherwise provided in the Plan or a Final Order of the Bankruptcy Court, the injunction described above Plan shall remain in full force and effect following the Effective Date.  All other injunctions or automatic stays provided for in the Bankruptcy Case pursuant to § 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

7.4    Disallowed Claims.  On and after the Effective Date, the Estate shall be fully and finally discharged of any liability or obligation on a Disallowed Claim.

7.5    Discharge.  Pursuant to § 1141(d), confirmation of the Plan and successful completion of payments thereunder shall grant the Debtors a discharge, to the fullest extent possible, of any and all debts and Claims of any nature whatsoever that arose at any time prior to the Effective Date.

7.6    Retention and Enforcement of Causes of Action.  Pursuant to § 1123(b)(3) of the Bankruptcy Code, the Reorganized Debtors shall retain and have the exclusive right to enforce any and all Causes of Action and rights of the Debtors that arose both before and after the Petition Date.

## ARTICLE 8

### EFFECTIVE DATE OF TRANSACTIONS

8.1    Effective Date. On the date following the Effective Date, the Reorganized Debtors shall be automatically substituted for the Debtors as a party to all contested matters, adversary proceedings, Claims, administrative proceedings, and lawsuits, both within and outside of the Bankruptcy Court, involving all assets, Claims against the Debtors, Causes of Action, and the resolution of any Disputed Claims, without the need to file any paper to accomplish same. All of the assets of the Estate shall vest in the Reorganized Debtors, and all privileges with respect to all assets of the Estate, including the attorney/client privilege, to which the Debtors are or would be entitled, shall automatically vest in, and may be asserted by or waived on behalf of,

the Reorganized Debtors.  Holders of liens in the Reorganized Debtors shall retain such liens to the same extent and priority as they were held in the Debtors.

## ARTICLE 9

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

9.1    Assumption of Executory Contracts and Unexpired Leases.

(a)    The Debtors are parties to unexpired Executory Contracts, including but not limited to non-residential real property leases and telecommunication leases. In connection with the sale of the Properties, the Debtors and any purchaser may elect certain Executory Contracts and Unexpired Leases they intend to assume and assign to the respective purchaser of the Property.  The Debtors anticipate that all Unexpired Leases will be assumed. Should any particular Property not be sold within sixty (60) days of the Effective Date of this Plan (or such later time as the Court subsequently orders), then the Debtors shall file notices of intent to assume or reject Executory Contracts and Unexpired Leases. The times for counterparties to Executory Contracts and Unexpired Leases to assert a Cure Amount shall be those set forth in the Bid Procedures and Bid Procedures Order.  If the Executory Contract or Unexpired Lease is not addressed through the sale process then the deadlines provided in this paragraph shall apply.

(b)    Cure of Defaults for Assumed, or Assumed and Assigned, Unexpired Leases. The deadline for any current tenant of the Debtors (under a real property or telecommunications lease) to object to the assumption and assignment of its lease or to assert a Cure Amount (as defined below) is November 12, 2021.  A "**Cure Amount**" is the amount that any tenant (or Executory Contract holder) believes is necessary to assume its lease pursuant to § 365 of the Bankruptcy Code. Any such objection related to the assumption and assignment of a lease or to a Cure Amount must state with specificity what Cure Amount the tenant believes is required with appropriate documentation in support thereof. If no objection is timely received, the Debtors shall be entitled to assume and assign all leases without further notice, and all tenants shall be forever barred, estopped and enjoined from asserting or claiming that any additional amounts are due or a defaults exist, or that there is any objection or defense to the assumption and assignment of such lease, including any argument that there exist conditions to assumption and assignment that must be satisfied under such lease or that any required consent to assignment has not been given.

(c)    Any monetary defaults under an Executory Contract or Unexpired Lease to be assumed or assumed and assigned, shall be satisfied, pursuant to § 365(b)(1) of the Bankruptcy Code, by payment of a Cure Amount in Cash at closing of the sale of a Property (or upon allowance if the Cure Amount is disputed), subject to the limitations described below, or on such other terms as the parties to such Executory Contract or Unexpired Leases may otherwise agree.

(d)    In the event of a dispute regarding: (1) the amount of any Cure Amount; (2) the ability of the Reorganized Debtors, any assignee, as applicable, to provide "adequate assurance of future performance" (with the meaning of § 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed or assumed and assigned; or (3) any other matter pertaining to assumption or the assumption and assignment, the Cure Amount shall be made following the entry of a Final Order resolving the dispute and approving the assumption or the assumption and assignment. Notwithstanding the foregoing, nothing herein shall prevent the Reorganized Debtors from settling any Cure Amount without further notice to or action, order, or approval of the Bankruptcy Court.

(e)    <u>Damages Upon Rejection</u>.  The Bankruptcy Court shall determine the dollar amount, if any, of the Claim of any Person or Governmental Unit seeking damages by reason of the rejection of any Executory Contract or Unexpired Lease; provided, however, that such Person or Governmental Unit files a Proof of Claim with the Bankruptcy Court before thirty (30) calendar days following the Confirmation Date or such other deadline established by the Bankruptcy Court.  To the extent any such Claim is allowed by the Bankruptcy Court by Final Order, such Claim shall become, and shall be treated for all purposes under the Plan as, an Allowed Unsecured Claim and the holder thereof shall receive distributions as a holder of an Allowed Claim in such Class as applicable pursuant to the Plan.

## ARTICLE 10

## RETENTION OF JURISDICTION

10.1    <u>Jurisdiction</u>.  Until the Bankruptcy Case is closed, the Bankruptcy Court shall retain the fullest and most extensive jurisdiction that is permissible, including that necessary to ensure that the purposes and intent of the Plan are carried out and to hear and determine all Claims that could have been brought before the entry of the Confirmation Order.  Except as otherwise provided in the Plan, the Bankruptcy Court shall retain jurisdiction to hear and determine all Claims against the Debtors and all Causes of Action brought by the Debtors.

10.2    <u>General Retention</u>.  Following Confirmation of the Plan, the Bankruptcy Court shall also retain jurisdiction for the purposes of classifying any Claim, or re-examining Claims that have been Allowed for purposes of determining such objections as may be filed with the Bankruptcy Court with respect to any Claim.

10.3    <u>Specific Purposes</u>.  In addition to the foregoing, the Bankruptcy Court shall retain jurisdiction for the following specific purposes after the Confirmation of the Plan:

(a)    to approve sales of Properties pursuant to this Plan;

(b)    to modify the Plan after Confirmation, pursuant to the Bankruptcy Rules and the Bankruptcy Code;

(c)    to correct any defect, cure any omission or reconcile any inconsistency in the Plan or the Confirmation Order as may be necessary to carry out the purposes and intent of the Plan, including the adjustment of the dates of performance under the Plan and any other documents related thereto in the event the Effective Date does not occur as provided herein, so

that the intended effect of the Plan and such other documents may be substantially realized thereby;

(d)     to assure the performance by the Debtors of their obligations under the Plan;

(e)     to enforce and interpret the terms and conditions of the Plan;

(f)     to hear and determine all applications for compensation of professionals and reimbursement of expenses under §§ 330, 331 or 503(b) of the Bankruptcy Code;

(g)     to hear and determine any Causes of Action over which the Bankruptcy Court has jurisdiction arising during the period from the Petition Date through the Effective Date, or in any way related to the Plan or the transactions contemplated hereby;

(h)     to determine any and all motions pending on Confirmation for the rejection, assumption or assignment of Executory Contracts or unexpired leases and the allowance of any Claim resulting therefrom;

(i)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(j)     to consider and act on the compromise and settlement of any Claim against the Debtors or their Estates;

(k)     to determine all questions and disputes regarding title to the assets of the Debtors or their Estates;

(l)     to enter such Orders as are necessary to implement and enforce the injunctions described herein;

(m)     to enter such Orders as are necessary to implement and enforce any other Orders entered in the Bankruptcy Case; and

(n)     to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code.

## ARTICLE 11

### CONDITIONS PRECEDENT TO EFFECTIVENESS

11.1    Conditions Precedent to Effectiveness.  Notwithstanding any other provision of this Plan or the Confirmation Order, the Effective Date of the Plan shall not occur until the following conditions are met.

(a)     The Confirmation Order has become a Final Order; and

(b)     The reserves provided for in Class 1 and Class 4 are fully funded in amounts sufficient to ensure the Class 1 and Class 4 Claimants are not Impaired.

12

## ARTICLE 12

## MISCELLANEOUS PROVISIONS

12.1    <u>Revocation of Plan</u>.  The Debtors reserve the right to revoke and withdraw this Plan before the entry of the Confirmation Order.  If the Debtors revoke or withdraws this Plan, or if the Confirmation of this Plan does not occur, then this Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtors or any other Person or to prejudice the rights of the Debtors or any other Person in any further proceedings involving the Debtors.

12.2    <u>Entire Agreement</u>.  This Plan, including any exhibits and annexes hereto, sets forth the entire agreement and undertakings relating to the subject matter herein and supersedes all prior discussions and documents.

12.3    <u>Administrative Claims Bar Date</u>.  Unless otherwise ordered by the Bankruptcy Court, the Confirmation Order will establish a bar date for Administrative Claims.  Holders of Administrative Claims must file a Request for Payment of Administrative Expense on or before such date.

12.4    <u>Governing Law</u>. Except to the extent that federal law (including, but not limited to, the Bankruptcy Code and Bankruptcy Rules) is applicable, the rights and obligations arising under this Plan shall be governed by and construed and enforced in accordance with the laws of the State of Florida, without giving effect to the principle of conflicts of law thereof.

12.5    <u>Severability</u>.  Should the Bankruptcy Court determine prior to the Confirmation Date, that any provision in this Plan is either illegal on its face or illegal as applied to any Claim such provision shall be unenforceable either to all holders of Claims or as to the holder of such Claim as to which the provision is illegal, respectively.  Such a determination of unenforceability shall in no way limit or effect the enforceability and operative effect of any other provision of the Plan.

12.6    <u>Time</u>.  In computing any period of time prescribed or Allowed by this Plan, the day of the act, event, or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the clerk's office inaccessible, in which the event the period runs until the end of the next day which is not one of the aforementioned days.

12.7    <u>Addresses for Distributions to Holders of Allowed Claims</u>.  Unless otherwise provided in a Final Order of the Bankruptcy Court, distributions to be made under this Plan shall be made by First Class United States mail, postage prepaid to: (a) the latest mailing address set forth in the Proof of Claim filed with the Bankruptcy Court by or on behalf of such holder, or (b) if no such proof of claim has been timely filed, the mailing address set forth in the Schedules. The Reorganized Debtors shall not be required to make any other efforts to locate or ascertain the address of the holder of any Claim.

12.8 <u>Setoffs</u>. Subject to the limitations provided in § 553 of the Bankruptcy Code, the Reorganized Debtors may, but shall not be required to, setoff against any claim and the payments or other distributions to be made pursuant to this Plan in respect of such Claim, Claims of any nature whatsoever the Reorganized Debtors may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors of any such Claim that the Reorganized Debtors may have against such holder.

12.9 <u>Successors and Assigns</u>. The rights, duties, and obligations of any Person or Governmental Unit named or referred to in this Plan shall be binding upon, and shall inure to the benefit of, the successors and assigns of such Person or Governmental Unit.

12.10 <u>Reservation</u>. If this Plan is not confirmed by the Bankruptcy Court for any reason, the rights of all parties in interest in the Bankruptcy Case shall be reserved in full. Furthermore, any concession or admission reflected herein or in the Disclosure Statement is made for purposes of this Plan only, and if this Plan does not become effective, no party in interest in the Bankruptcy Case shall be bound or deemed prejudiced by any such concession or admission.

## ARTICLE 13

### MODIFICATION

13.1 <u>Modification of Plan</u>. The Debtors may propose amendments to, or modification of, this Plan under § 1127 of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date, the Reorganized Debtors or Debtors may remedy any defects or omissions or reconcile any inconsistencies in this Plan or the Confirmation Order or any other Order entered for the purpose of implementing this Plan in such manner as may be necessary to carry out the purposes and intent of this Plan so long as the interests of the holders of Claims are not materially and adversely affected.

## ARTICLE 14

### NOTICES

14.1 <u>Notices</u>. All notices, requests, elections or demands in connection with this Plan shall be in writing and shall be mailed by registered or certified mail, return receipt requested to:

Scott A. Underwood    or    Megan W. Murray
UNDERWOOD MURRAY, P.A.
100 N Tampa St., Suite 2325
Tampa, FL 33602
sunderwood@underwoodmurray.com
mmurray@underwoodmurray.com

14.2 <u>Notice of Default</u>. Prior to pursuing any remedies upon a default under the Plan, a creditor asserting such default must provide notice of such default pursuant to the provisions of Section 15.1 of the Plan within three (3) business days of the occurrence of such default. The

Notice of Default must contain the following: (i) the alleged default; (ii) the date of the alleged default.

Dated: November 8, 2021

Respectfully submitted,

Parusa Investment Corporation

By: *Christophe Rothpletz*

Christophe Rothpletz, President

FICO Financial Corporation

By: *Christophe Rothpletz*

Christophe Rothpletz, President

/s/  Scott A. Underwood
Scott A. Underwood
Florida Bar Number 0730041
Megan W. Murray
Florida Bar Number 0093922
Adam M. Gilbert
Florida Bar Number 1011637
UNDERWOOD MURRAY, P.A.
100 N Tampa St. Suite 2325
Tampa, FL 33602
Tel: (813) 540-8401 / Fax: (813) 553-5345
Email: sunderwood@underwoodmurray.com
         mmurray@underwoodmurray.com
         agilbert@underwoodmurray.com
*Counsel to the Debtors*